800 F.2d 33
 Herbert BADGLEY, James Barnes, Mitchell Chapman, Robert
Gunsberg (a/k/a Robert Alvino), Maurice McCorkle, Frank
Ricchiuti, Oscar Rodriguez and Henry Smith, inmates of the
Nassau County Correctional Center, and Eugene Chapman, Lee
McCorkle and Katherine Ricchiuti, members of inmates'
families, individually and on behalf of all persons
similarly situated, Plaintiffs-Appellants,
v.
Joseph J. SANTACROCE, Sheriff of Nassau County; Walter J.
Flood, Warden of Nassau County Correctional Center; William
G. McMahon, Chairman, New York State Commission of
Correction; Thomas A. Coughlin, Commissioner, New York
State Department of Correctional Services, individually and
in their official capacities, Defendants-Appellees.
 No. 1062, Docket 86-2035.
 United States Court of Appeals,
Second Circuit.
 Argued May 29, 1986.
Decided Aug. 25, 1986.
 
 Morton J. Marshack, Mineola (Matthew Muraskin, Attorney in Charge, Michael J. Obus, Sharon E. Kivowitz, Legal Aid Society, Mineola, on the brief), for plaintiffs-appellants.
 James M. Catterson, Jr., Port Jefferson (William H. Pauley III, Scott M. Yaffe, Snitow & Pauley, New York City, on the brief), for defendants-appellees Joseph J. Santacroce and Walter J. Flood.
 Robert K. Drinan, Asst. Atty. Gen., Mineola (Robert Abrams, Atty. Gen., Mineola, on the brief), for defendants-appellees William G. McMahon and Thomas A. Coughlin.
 Before FEINBERG, Chief Judge, and NEWMAN and KEARSE, Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 More than two years ago, this Court characterized as a "disaster" the persistent violation by the Nassau County Sheriff and the Warden of the Nassau County Correctional Center ("NCCC") of a consent judgment limiting inmate population at the NCCC. Badgley v. Varelas, 729 F.2d 894, 902 (2d Cir.1984) ("Badgley I"). We now confront a situation of continuing violation of an amended consent judgment and discover that, since we last saw this case, little if any meaningful action has been taken to alleviate the overcrowding at the NCCC. The current situation must now be remedied--promptly and effectively. On this appeal by inmates of the NCCC from the judgment of the District Court for the Eastern District of New York (Jacob Mishler, Judge), which denied the inmates' motion to hold the county defendants in civil contempt, we conclude that the District Court erred in finding that compliance with the terms of the amended consent judgment was impossible. We therefore reverse and remand the case to the District Court with instructions to enforce the provisions of the amended consent judgment for ensuring compliance with the judgment's population limit.
 
 Background
 
 2
 This appeal is the latest episode in a Dickensian saga of prison overcrowding and bureaucratic excuse and delay. The complex early history of this litigation, from the filing of a suit in 1980 by NCCC inmates seeking a declaration that conditions at the jail violated their constitutional rights, to late 1983, is recounted in our decision in Badgley I, familiarity with which is assumed. That decision considered various orders entered by the District Court to implement a consent judgment, signed by the Sheriff and the Warden in 1981, which provided for a maximum population of 808 at the NCCC. We instructed the District Court to enforce that judgment by enjoining the county defendants from accepting any person for confinement at the NCCC until the inmate population had been reduced to 808 and thereafter from accepting any person, if that person would increase the population above 808. 729 F.2d at 902.
 
 
 3
 On March 13, 1984, the District Court complied with our mandate and issued a remedial order prohibiting intake of inmates over the population maximum. The county defendants moved to recall our mandate and to extend the remedial order's effective date. We denied the motion. The county defendants then moved to modify the judgment, requesting an increase in the population maximum and seeking authority to accept the most serious offenders, those charged with class A or B felonies and those held without bail or with bail of $100,000 or more, without regard to the population cap. After holding a hearing, the District Court rendered a decision that, among other things, increased the population limit to 900. While an appeal from that decision was pending, the parties negotiated an agreement to amend the consent judgment. We remanded to permit the District Court to consider the new agreement. An amended consent judgment was approved by Judge Mishler on October 9, 1984.
 
 
 4
 The amended consent judgment slightly increases the inmate population limit and also incorporates an enforcing mechanism. Paragraph 4 provides that "the actual maximum in-house population of the NCCC shall not exceed 710 [the maximum allowable in cells] plus the number of inmates actually housed in [newly constructed] dormitories." Paragraph 3 establishes the maximum capacity of the new dormitory housing as 157. Thus, the judgment contemplates a maximum in-house population of 867. Paragraph 31 incorporates, with appropriate numerical adjustments, the remedial provisions ordered by the District Court in March 1984 in conformity with Badgley I: The Sheriff of Nassau County must not deliver any person to the NCCC until the in-cell population is no more than 710 and must not deliver any person who would increase the population above 710, the Warden of the NCCC must not accept any person until the in-cell population is no more than 710, and the Warden must notify all courts and agencies that send prisoners to the NCCC for confinement any time the in-cell population equals or exceeds 685 for five consecutive days. Paragraph 32 allows the defendants to accept, "without regard to the in-house population cap," persons charged with class A or B felonies and persons held without bail or with bail of $100,000 or more.
 
 
 5
 Beginning on October 7, 1985, the county defendants began housing inmates at the NCCC above the in-cell limit of 710. Since that time, the defendants' record of compliance with the amended consent judgment has been abysmal. Paragraph 28 of the judgment requires the defendants to provide plaintiffs with weekly inmate population statistics. A review of the statistics for weekday population between October 7, 1985, and March 28, 1986,[1] reveals that the in-cell maximum was met on only fifteen days. The average daily in-cell population at the NCCC was 732 for November, 712 for December, 746 for January, 739 for February, and 751 for March. On March 17, 1986, the in-cell population rose to a high of 781; that same day, the total in-house population (including inmates in dormitories) was 961. Overcrowding in violation of the amended consent judgment has been the rule and compliance the rare exception.
 
 
 6
 On October 17, 1985, the plaintiffs moved for an order holding the county defendants in contempt of court for violation of paragraph 31 of the amended consent judgment. After a series of hearings, the District Court on January 6, 1986, concluded that the county defendants had not willfully violated the judgment, that they had made every reasonable effort to comply with the population limit, and that it was impossible for them to comply with the judgment without the assistance of state officials. The Court therefore denied the contempt motion, and the inmates appealed. We now reverse.
 
 Discussion
 
 7
 The purpose of civil contempt, broadly stated, is to compel a reluctant party to do what a court requires of him. Because compliance with a court's directive is the goal, an order of civil contempt is appropriate "only when it appears that obedience is within the power of the party being coerced by the order." Maggio v. Zeitz, 333 U.S. 56, 69, 68 S.Ct. 401, 408, 92 L.Ed. 476 (1948). A court's power to impose coercive civil contempt is limited by an individual's ability to comply with the court's coercive order. Shillitani v. United States, 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966); Maggio v. Zeitz, supra, 333 U.S. at 72-73, 68 S.Ct. at 409-10. A party may defend against a contempt by showing that his compliance is "factually impossible." United States v. Rylander, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983). In raising this defense, the defendant has a burden of production, id., that may be difficult to meet, see Natural Resources Defense Council, Inc. v. Train, 510 F.2d 692, 713 (D.C.Cir.1975); Aspira of New York, Inc. v. Board of Education, 423 F.Supp. 647, 654 (S.D.N.Y.1976), particularly in cases such as this where the defendants have a long history of delay and the plaintiffs' needs are urgent, cf. Fortin v. Commissioner of Massachusetts Department of Public Welfare, 692 F.2d 790, 797 (1st Cir.1982).
 
 
 8
 A classic application of the factual impossibility defense arises when a court orders an individual to produce documents that are not in his possession or control. See United States v. Rylander, supra; Falstaff Brewing Corp. v. Miller Brewing Co., 702 F.2d 770, 781 (9th Cir.1983). Similarly, a witness who refuses to answer a grand jury's questions cannot be held in contempt after the term of the grand jury expires, since it is no longer possible for the witness to purge himself of the contempt by testifying. See Shillitani v. United States, supra. And an inability to comply with an order requiring the payment of money because of poverty or insolvency will generally be a defense to contempt. See In re Sobol, 242 F. 487, 489 (2d Cir.1917); Securities Investor Protection Corp. v. Executive Securities Corp., 433 F.Supp. 470, 473 (S.D.N.Y.1977). In all these situations, the contempt is excused because compliance is literally impossible and, as a result, any attempts at coercion are pointless.
 
 
 9
 By contrast, on the undisputed facts of this case, nothing makes it factually impossible for the Sheriff to cease delivering persons to the NCCC or for the Warden to refuse to accept such persons until the population requirements of the amended consent judgment are met. As we noted in Badgley I, 729 F.2d at 902, if a natural disaster such as fire or disease required the NCCC to be closed, the county defendants would place the inmates elsewhere and would not deliver or accept new prisoners until the crisis ended. The continued violation of the amended consent judgment is a legal crisis of equal gravity, and it is obvious that the defendants are just as able to decline to deliver and accept new prisoners until this crisis is ended. The terms of the amended consent judgment automatically operate, whenever the population limit is exceeded, to close the jail's doors as tightly as would fire or disease.
 
 
 10
 The specific difficulties of compliance asserted by appellees do not justify a finding of impossibility. The county defendants seemed to acknowledge at oral argument that compliance is hindered by political difficulties rather than physical impossibilities. Though cooperation between state and county authorities might well contribute to a resolution of the problems faced by the County, the political difficulties do not make it impossible for the defendants to stop adding more prisoners at the NCCC.
 
 
 11
 In the District Court the defendants suggested that compliance might violate state law. However, it is not at all clear that the Sheriff and the Warden must violate New York law to comply with the judgment. The New York Court of Appeals has ruled that prison overcrowding renders a jail sufficiently unsafe to justify an application to state authorities for an alternative place for confinement of inmates under New York Correction Law Sec. 504(1) (McKinney Supp.1986). See Adams v. Meloni, 63 N.Y.2d 868, 870, 482 N.Y.S.2d 469, 470-71, 472 N.E.2d 319, 320-21 (1984). Section 504(1) requires the State Commission of Correction to designate an alternate site upon application. The county defendants do not contend that designation of an alternate place to house inmates has ever been sought and denied. Thus, the defendants seem to have available a course of action that would allow them to comply with both the amended consent judgment and state law.
 
 
 12
 The defendants also suggested to the District Court that compliance might place them in contempt of the state courts that send them prisoners. Justice Arthur D. Spatt, Administrative Judge for Nassau County, told the District Court that, if the Sheriff refused to accept prisoners committed to his custody by local criminal courts, he would be in contempt of those courts. Significantly, however, he added that state judges do not commit prisoners to specific facilities and would not direct the Sheriff to take prisoners to the NCCC in light of the federal court's order barring delivery and acceptance of additional inmates. Compliance with the amended consent judgment has not been shown to pose a risk of contempt of state courts.
 
 
 13
 Even if a state court would hold the defendants in contempt for refusing to house inmates at the NCCC, or if compliance would otherwise violate state law, Supremacy Clause considerations require that the judgment of the federal court be respected. Washington v. Washington State Commercial Passenger Fishing Vessel Association, 443 U.S. 658, 695, 99 S.Ct. 3055, 3079, 61 L.Ed.2d 823 (1979); see Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Ableman v. Booth, 21 How. (62 U.S.) 506, 16 L.Ed. 169 (1859). In any attempt by a state court to hold defendants in contempt for taking actions required by the judgment of the District Court, that judgment would provide a complete defense.
 
 
 14
 The respect due the federal judgment is not lessened because the judgment was entered by consent. The plaintiffs' suit alleged a denial of their constitutional rights. When the defendants chose to consent to a judgment, rather than have the District Court adjudicate the merits of the plaintiffs' claims, the result was a fully enforceable federal judgment that overrides any conflicting state law or state court order.[2] The strong policy encouraging settlement of cases requires that the terms of a consent judgment, once approved by a federal court, be respected as fully as a judgment entered after trial.[3]
 
 
 15
 Appellees argue that we should not substitute our conclusions for those of the District Court because the District Court's finding of impossibility is supported by substantial evidence and is not clearly erroneous. It is true that the District Court's finding of impossibility is based on certain findings, for example, that compliance would violate state law. That finding is not one of fact and, as we have suggested, may well be incorrect. In any event, the District Court's conclusion that its findings are sufficient to prove impossibility of compliance is a legal ruling not entitled to a deferential standard of review. Because it is not impossible, as that term is used in the law of civil contempt, for the defendants to comply with the amended consent judgment, the District Court's finding to the contrary is incorrect as a matter of law and must be reversed.
 
 
 16
 Finally, we note that some clarification must be made concerning the meaning of paragraph 32 of the amended consent judgment, which allows the county defendants to accept, "without regard to the in-house population cap," persons charged with class A or B felonies and persons held without bail or with bail of $100,000 or more. The defendants have suggested that this provision not only entitles them to accept such persons without regard to the population limit but also to disregard them entirely in implementing the remedial provisions of the judgment. In the defendants' view, acceptance of such inmates, once the jail population is at or above the specified limit, would automatically effect a permanent increase in the limit. Upon reviewing the record, we find that this reading is irrational and could not possibly reflect the intent of the parties in drafting paragraph 32. Correctly read, the provision simply allows the Sheriff to deliver and the Warden to accept a certain class of persons even if their presence at the NCCC will temporarily increase the inmate population over the judgment's maximum limit. Once accepted, however, these persons must be counted in the jail's population, and no additional persons (other than those allowed by paragraph 32) may be accepted until the NCCC population has fallen below the maximum limit.
 
 Conclusion
 
 17
 Compliance with the amended consent judgment must now occur, and the remedial provisions of that judgment must be put into effect. We will allow a delay of thirty days only to permit necessary notification to the appropriate court, agency, and police officials.
 
 
 18
 The judgment of the District Court is reversed, and the cause is remanded with directions to enter forthwith an order (1) declaring paragraph 31 of the amended consent judgment to be operative thirty days after the date of this Court's decision and (2) requiring the county defendants promptly to give notice to all courts, police departments, and other federal, state, and local governmental agencies that send persons for confinement at the NCCC that, thirty days after the date of this Court's decision, the NCCC will be unavailable to house additional persons, except to the extent permitted by paragraph 32. The District Court is also directed to hold the county defendants in civil contempt in the event of any subsequent failure to implement paragraph 31 of the amended consent judgment and, in that event, to assess compensatory damages in favor of the plaintiffs of not less than $5,000 for each person admitted to the NCCC in violation of the amended consent judgment and to order any additional remedies that may be appropriate. The mandate of this Court shall issue forthwith.
 
 
 
 [1]
 Obviously, population figures for the period after the District Court's decision were not before the District Court. However, these figures, provided in accordance with the terms of the amended consent judgment, are useful both to illustrate the magnitude of the problem at the NCCC and to belie the county defendants' contention, in an affidavit filed in opposition to plaintiffs' contempt motion, that instances of overcrowding in violation of the amended consent judgment are "isolated."
 
 
 [2]
 In a somewhat analogous context, though not involving the Supremacy Clause, two related cases have held the federal interest superior to that of a foreign sovereign in rejecting an impossibility defense that compliance with an IRS summons would violate a foreign court's injunction. See United States v. Chase Manhattan Bank, N.A., 590 F.Supp. 1160 (S.D.N.Y.1984); Garpeg, Ltd. v. United States, 588 F.Supp. 1240 (S.D.N.Y.1984). The District Courts, though according great weight to the foreign sovereign's "vital interests," 590 F.Supp. at 1162 n. 3, nevertheless found the federal interest dominant and held the non-complying party in civil contempt
 
 
 [3]
 The Supreme Court has recently held that a consent judgment enables a federal court to adopt remedial measures broader than those available after a trial. See Local 93, International Association of Firefighters v. City of Cleveland, --- U.S. ----, ----, 106 S.Ct. 3063, 3076-77, 92 L.Ed.2d 405 (1986)