James BENJAMIN, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, et al., Defendants.

Ernesto MALDONADO, et al., Plaintiffs,

v.

William CIUROS, Jr., et al., Defendants.

DETAINEES OF the BROOKLYN HOUSE OF DETENTION FOR MEN, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, et al., Defendants.

DETAINEES OF the QUEENS HOUSE OF DETENTION FOR MEN, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, et al., Defendants.

Iola FORTS, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, et al., Defendants.

Nos. 75 Civ. 3073 (MEL), 76 Civ. 2854 (MEL), 79 Civ. 4913 (MEL), 79 Civ. 4914 (MEL) and 76 Civ. 101 (MEL).

United States District Court, S.D. New York.

Nov. 10, 1986.

See also 629 F.Supp. 713.

Philip L. Weinstein, Theodore H. Katz, Jonathan S. Chasan, John A. Beck, The Legal Aid Society, New York City, for plaintiffs.

Frederick A.O. Schwarz, Jr., Corp. Counsel of City of N.Y., New York City, for defendants; Leonard Koerner, Paul Rephen, of counsel.

LASKER, District Judge.

This is an application by the City defendants for an order modifying the orders of this court dated September 3, 1980 (which imposed a population cap of 1200 on the House of Detention for Men), June 23, 1981 (which imposed a sixty square foot—fifty person limitation on the dormitories in City correctional facilities) and October 31, 1983 (which directed compliance with the earlier orders).[1] Although the moving papers do not specify the authority for making such a motion, the parties have throughout regarded it as a motion brought under Federal Rule of Civil Procedure 60(b). As indicated below, the relief requested is partially of a temporary nature and partially permanent.

The City's position may be summarized as follows. Since 1983, when an overpopulation crisis resulted in the release of inmates from the House of Detention for Men, the City has constructed several thousand cells and has plans to build several thousand more. In spite of this considerable increase in available space, the increase in the number of detainees and other classes of prisoners has outstripped the expanded number of prison beds so that the City is unable to house prisoners at the present time within the limitations of the 1980 and 1981 decrees. The City asserts

---

1. Much of the long history of this case, as well as many of the basic legal issues involved, was discussed in full in two prior decisions in *Benja-min v. Malcolm,* 495 F.Supp. 1356 (S.D.N.Y. 1980) and 564 F.Supp. 668 (S.D.N.Y.1983).

that a major and unforeseen cause of the present crisis is the arrival on the drug market of the cocaine derivative known as "crack". As a result of the unforeseen substantial trading in "crack" occurring in New York City, the City contends that a much larger number of arrests than could have been anticipated has been made and that a much larger number of those arrested have been "retained" than is normal, that is, have been detained because of bail conditions imposed by state courts which inmates are unable to meet.

The City makes two major contentions as to why the decrees should be modified, one based on an alleged change of law and the other on alleged changes of fact. As to the first, the City argues that the decision in *Lareau v. Manson*, 651 F.2d 96 (2d Cir. 1981), constitutes a change in the law as it existed at the time the 1980 and 1981 decrees were entered, and that *Lareau* authorizes a permanent arrangement for the holding of prisoners for a limited period of time under the conditions specified in the modifications here being requested. The City also relies on the decision of the Court of Appeals in *New York State Association for Retarded Children v. Carey*, 706 F.2d 956 (2d Cir.1983) (*Willowbrook*), a seminal ruling with regard to the modification of decrees in institutional reform cases in which Judge Friendly, speaking for the court, established principles of flexibility in dealing with such cases. The changes of fact since the date of the decrees on which the City relies, relate substantially, if not exclusively, to the growth in arrests and detentions caused by the arrival of "crack" on the scene.

The plaintiffs strenuously oppose the application for modification of the decrees and differ with the City as to the law and the facts. Conceding that the arrival of "crack" may have caused substantial additional arrests and detentions, the plaintiffs nevertheless assert that the present crisis is the result of the City's own inefficiency in population forecasting, its insufficient reliance on non-incarcerative procedures and its tardiness in waiting to apply to the court for relief until only days before the

relief was required rather than doing so months before when the "crack" crisis and its inevitable impact on detention facilities became fully apparent.

The plaintiffs disagree with the City's construction of *Lareau* and *Willowbrook*. It is their position that *Lareau* was a fact-oriented case which did not establish as a general principle that detainees could be held in substandard conditions for limited periods of time and that, although *Willowbrook* may have established standards of flexibility as to modification of decrees in institutional reform cases, it nevertheless limited courts to modifying such decrees only in cases where the modification would enhance the primary purpose of the original decree. The plaintiffs urge that the more relevant case is *Badgley v. Santacroce*, 800 F.2d 33 (2d Cir.1986) (*Badgley II*), in which the Court of Appeals unanimously reversed the district court for failure to hold Nassau County officials in contempt in what the plaintiffs regard as a similar crisis in Nassau County. The plaintiffs also rely on *Badgley v. Varelas*, 729 F.2d 894 (2d Cir.1984) (*Badgley I*), in which the Court of Appeals held that the judicial remedy for overcrowding should be to enjoin correctional officials from accepting prisoners beyond the authorized maximum rather than the release of prisoners already in custody. The plaintiffs argue that the remedy for the present situation is not to grant a modification of the decrees but to enjoin the correctional officials from accepting more detainees than the present decrees allow.

## I. *Legal Framework*

Before coming to the question of the merits of the application, it is necessary to construe the decisions in *Willowbrook*, *Lareau* and *Badgley*.

### 1. *Willowbrook*

*Willowbrook* not only authorizes flexibility but encourages it under appropriate circumstances. Judge Friendly, speaking for the court, made clear that it is a responsibility of the District Court to give serious and deliberate consideration to a good faith

application for modification of a decree if it is based on a significant change in the law or the facts. *Willowbrook,* 706 F.2d at 970–71. Plaintiffs read *Willowbrook* too narrowly when they argue that the only modifications sanctioned by that case are those which advance or enhance the purpose of the decree. The modification allowed in *Willowbrook,* was only found not to be "in derogation of the primary objective of the decree." *Willowbrook,* 706 F.2d at 969. It is true that "[w]e are not at liberty to reverse under the guise of readjusting," *United States v. Swift & Co.,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), and hence cannot "reconsider the primary purposes of the decrees: to relieve unconstitutional strains on the facilities caused by overcrowding," *Benjamin v. Malcolm,* 564 F.Supp. 668, 686 (S.D.N.Y. 1983). However, *Willowbrook* not only allows but directs the court to consider the City's requests for modification "with generosity," 706 F.2d at 971, if it is determined that they will not result in unconstitutional conditions in derogation of the primary purpose of the decrees. Furthermore:

> It is well recognized that in institutional reform litigation ... judicially-imposed remedies must be open to adaption when unforeseen obstacles present themselves, ... and to accommodation of a wider constellation of interests than is represented in the adverserial setting of the courtroom.

*Willowbrook,* 706 F.2d at 969. Here, where the public interest may well be affected by this decision, the court has a duty to act upon those modifications which will not result in unconstitutional conditions at the affected jails. *See Duran v. Elrod,* 760 F.2d 756, 760 (7th Cir.1985) (in modifying jail consent decree, district judge "must consider the concrete impact of modification on both parties, and also on the public"). Accordingly, it is clear that *Willowbrook* does not stand as a bar to granting the relief requested.

### 2. *Lareau*

*Lareau* neither compels the granting of the requested relief nor authorizes it on a permanent basis. *Lareau* directs district courts to consider the particular circumstances of each case and the particular facility in question, *Lareau,* 651 F.2d at 103, in determining whether, in the totality of the circumstances, overcrowding violates constitutional standards. *Id.* at 107. Hence, *Lareau* cannot be read as a blanket authorization for even the limited temporary modification granted in that case. Moreover, while *Lareau* legitimates in some cases the temporary housing of prisoners in conditions which are more stringent than those that would otherwise be constitutionally acceptable if those conditions were to last for longer periods of time, it does so only where that arrangement is a temporary expedient and in cases where the community is within sight of making new facilities available. Judge Mansfield made it clear that the relief granted was only for a limited, finite period of time, "representing an effort to take account of the feasibility of compliance in a situation where the state has made detailed plans and achieved substantial progress with the construction of a new facility which should relieve the problem altogether." *Id.* at 105 n. 5. In sum, *Lareau* allows the temporary holding of detainees in what might otherwise be called sub-standard conditions for a short period of time when the solution to the crisis is in sight but not for an indefinite or permanent period. Accordingly, even if *Lareau* were to represent a change of the law since the entry of the decrees, it would not authorize on a long term basis the relief being sought here.[2]

### 3. *Badgley II*

*Badgley II* stands for the proposition that where a community makes no effort to overcome conditions which have been adjudicated to be unconstitutional, the district court is obligated to enforce its decree,

---

2. As it happens, however, *Lareau* was decided three weeks prior to the entry of the 1981 decree, *Benjamin,* 564 F.Supp. at 688 n. 16, al-

though under the flexible standards of *Willowbrook* that fact alone would not necessarily be decisive.

whether it is a consent or an adjudicated judgment, and to use the power of contempt, if necessary. The *Badgley II* court rejected the defendants' argument that obedience to the decree in that case was factually impossible. *Badgley II,* 800 F.2d at 37. However, there is a critical difference betweeen the situation in *Badgley II* and the case at hand. The Nassau County defendants in *Badgley II* had taken "little if any meaningful action" to comply with the decree, *id.* at 35, and had not even applied to the state for assistance in housing their overflow inmates. *Id.* at 37. Here, in contrast, although the City must bear a significant share of responsibility for the present crisis, it has made and is continuing to make substantial good faith efforts to keep up with the situation. Hence, *Badgley II* does not control the present case.

In sum, the cases in question neither prevent the court from granting the relief requested nor compel it to do so.

## II. *Merits of the Requests for Modification*

Although none of the cases relied on require the court either to grant or deny the modifications requested, two questions remain for determination:

First, did the rise in arrests caused by the "crack" epidemic constitute a new and unforeseeable condition sufficient to warrant modification of the decrees or does the City itself bear responsibility for failing to foresee the present overcrowding crisis?

Second, are the defendants' requested modifications, each of which must be tested separately, constitutionally acceptable or are they in derogation of the primary purpose of the decrees to ensure constitutionally minimal conditions for detainees?

■ As to the first question, the City cannot evade the fact that it bears a significant share of responsibility for the current crisis in its jails. First, the City has consistently underestimated the projected jail populations and continued to do so even after the "crack" crisis commenced, Affidavit of Theodore H. Katz, October 27, 1986

at ¶¶ 12–19 ("Katz Affidavit"); second, the City still has no organized and central plan of population control and of non-incarcerative dispositions, *id.* at ¶¶ 46–53; and third, the City waited far too long before coming to the court to inform the court of the drastic problems being encountered. Nevertheless, the arrival on the scene of "crack" has created a substantial factual change which it would be irresponsible to ignore and which was not itself foreseeable, although the City is responsible for failing to take the foreseeable consequences of the "crack" problem into account in planning.

As to the second question, each request for modification must be considered separately.

## A. *Request for Temporary Increases in Dormitory Populations*

■ In the circumstances, dormitory housing of forty square feet for a maximum period of fifteen days meets constitutionally acceptable standards at the main building of the North Facility, but for a limited and definite period only. Observations of the newness and decency of the physical plant made during a recent visit to the North Facility, a building which did not even exist at the time the consent decrees were entered, in combination with the representations and specifications made in the Commissioner's affidavits as to the increased services which will be provided to the new admissions who will be housed at the North Facility under such crowded conditions, *see* Affidavits of Richard J. Koehler, October 21, 1986, and October 30, 1986, lead to the conclusion that it is constitutionally tolerable to allow inmates to be housed at forty square feet in the North Facility for a single fifteen day period on a temporary basis for a limited and definite period as an emergency measure, designed to give the City an additional period of time to cope with the current population crisis. However, even with increased services, detainees will probably spend the vast majority of the day in their housing areas, and the large increase in population may well strain even the new services. *See* Letter to Court

of Theodore H. Katz, November 3, 1986 (calculating that even with increased services planned by Department of Corrections, inmates will only spend one half hour out of housing areas, excluding meals). For these reasons, by a time to be determined after further briefing, the City must have an alternative plan which will conform with the consent decrees and may not expect or rely on further extensions. *Lareau* itself declares that: "flexibility for the state, whatever its good faith, can ultimately only go so far. Unconstitutional conditions cannot be tolerated because constitutional requirements are difficult for the state to fulfill." *Lareau*, 651 F.2d at 110 n. 14.

■ The City's request for *Lareau* -type housing is denied as to the Annex to the North Facility, the Correctional Institute for Women ("CIFW") and the Adolescent Reception and Detention Center ("ARDC"). Observations on conditions at the Annex and CIFW, and the uncontradicted facts contained in plaintiffs' affidavits in opposition to this motion lead to the conclusion that any further overcrowding at the Annex, CIFW and the ARDC would severely aggravate already dangerously tense situations. The Annex is an aging building, originally a garage and vocational center. Detainees housed at there are handcuffed whenever they are transported to the main facility for services and activities. Katz Affidavit at ¶¶ 67–68. To house more detainees there would impose an unconstitutional burden on an already marginal situation. As for CIFW, that institution faces unique strains because of the mix of male, female and adolescent populations there. Because of this complication, even under present conditions, inmates at CFIW experience delays in receiving necessary services. *Id.* at ¶¶ 86–90. This situation should not be further aggravated. Finally, the record also demonstrates the fragile balance of conditions and the particularly volatile nature of the population at ARDC. *Id.* at ¶¶ 94–99. To add to population there would, under these circumstances, tip the constitutional balance.

### B. *Permanent Modification in Square Footage Requirements at Correctional Institute For Women*

■ At present, women at CIFW are housed at approximately seventy square feet, and, in some cases their beds are separated by privacy partitions. The City requests approval for reducing the space allotted to each detainee to sixty square feet, which is the standard footage applied in all other decree provisions. Given that all other detainees covered by the decrees are housed at sixty square feet, it cannot reasonably be concluded that it would be unacceptable to house CIFW detainees at that figure. Moreover, counsel for the City has orally represented to the court that even with the reduced square footage, the affected dormitories at CIFW will conform to the requirements of the decrees which set a fifty person cap per dormitory. Because of the problems at CIFW described above, however, the privacy partitions in existence should not be removed. Accordingly, the City's request is granted except as to accommodations in which the reduction of square footage would cause the elimination of existing partitions.

### C. *"Jumbo" Cells at the Anna M. Kross Center*

■ Since both parties agree that the "jumbo" cells at the Anna M. Kross Center ("AMKC"), which are 180 square feet, can acceptably house three inmates rather than two, the City's request as to those cells is granted.

### D. *Requests For Permanent Modification as to Convicted but Sentenced Inmates and Alleged Parole Violators*

■ The City has requested a permanent modification of the consent decree to allow the housing of convicted but not sentenced inmates and alleged parole violators at forty square feet. This application is denied.

The City contends that neither detainees who have been convicted but not yet sentenced nor detainees who are also alleged parole violators are covered by the decrees,

the former because a determination of guilt has been made, and the latter because "[t]hey have been convicted of a crime and can be housed immediately in a State prison pending their parole revocation hearings." Defendants' Memorandum in Support of Modification of Orders dated September 3, 1980, June 23, 1981 and October 31, 1983 at 8. Plaintiffs argue that both groups of detainees have always been treated in the same way as other detainees, and that the City's arguments are legally untenable. Whether judged on the basis of the interpretation of the decrees by the parties themselves over a period of many years, or by legal theories which make distinctions between detainees and other classes of prisoners or by standards in the correctional profession, there is no merit to the City's position. It is, of course, a cardinal principle of interpretation of contracts and other bi-lateral arrangements that disputed terms be judged in accordance with the parties' own practical application of those terms if there is history on the point. In the present situation, there is plenty of history. The decrees in question have been in force for years. Throughout the course of their administration, the City itself has consistently treated both detainees who were convicted but not sentenced and those who were facing charges of parole viola-

tion as well as substantive charges, in exactly the same fashion as all other detainees. Never until this housing crisis arose has it suggested that there was any basis in the decrees or elsewhere for treating such subgroups any differently from detainees in general.

This history of the City's own interpretation of the decrees is of substantial significance and could well by itself be sufficient to settle the matter. However, we need not rely solely on the parties' interpretation of the contract. Legal theory offers no support for the City's position. While *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 477 (1979), has established a legal distinction between the constitutional rights of detainees who may not be punished, and sentenced prisoners who may be punished, neither *Wolfish* nor any of the myriad of prisoner condition cases of recent years has suggested the existence of either of the hybrid groups suggested by the City: detainees who are convicted but not sentenced, and detainees who are also held on parole violation charges. In this regard, legal theory accords with professional correctional practice which, like the many legal decisions, makes treatment distinctions between detainees and sentenced prisoners, but goes no further.[3]

---

**3.** Both the *Wolfish* and *Lareau* decisions refer variously to "pre-trial detainees" and "sentenced inmates", classifications which seem not to acknowledge the existence of a subset of inmates who have been determined guilty but not sentenced. Furthermore, under the logic of *Wolfish*, it seems anomalous to "punish" detainees who have been convicted but still await sentencing, when they may well be given a suspended sentence, put on probation or be permitted to withdraw guilty pleas. In sum, while the Supreme Court in *Wolfish* clearly did not consider the status of convicted but not sentenced inmates, these inmates should logically be grouped with pre-trial detainees for whom the Fourteenth Amendment test must be applied. State law, to the extent it provides any guidance in this determination of federal constitutional issues, tends to support plaintiffs rather than defendants. While it is true, as defendants point out, that under New York law "conviction" is defined as occurring upon a determination of guilt rather than upon sentencing, New York Crim.Proc.Law § 1.20(13), (McKinney 1981), we are not concerned here so much with

the definition of "conviction" as with the definition of "detainee," and there are indications that under New York law inmates are considered detainees up until the time of sentencing. An inmate is in the custody of the sheriff for "the pendency of the criminal action ...," N.Y.Crim. Proc.Law § 500.10(4) (McKinney 1984), and "criminal action" is defined as beginning with the filing of the accusatory instrument and terminating "with the imposition of sentence...." N.Y.Crim.Proc.Law § 1.20(16) (McKinney 1981). As to the alleged parole violators, the City's argument that these detainees could be housed in state institutions in worse conditions than those that exist in the City jails is not persuasive. First, it is far from clear that alleged parole violators could be housed at state institutions under New York State law, since alleged parole violators taken into custody are "insofar as practicable, [to] be incarcerated in the county or city in which the arrest occurred," N.Y. Exec.Law § 259-i(3)(b) (McKinney 1982), and the wording of the statute suggests that they are to be held in custody in local rather than state institutions. Second, conditions at state institu-

### E. *Request to Add Sixty Inmates to the House of Detention for Men*

Currently the population cap at the House of Detention for Men ("HDM") is 1200. HDM is divided into eight housing blocks, each of which has a population cap of 150. One of these, however, houses special detainees and its population is set at ninety. The City has made a request for permanent modification to allow it to house sixty additional inmates in the seven general housing blocks, which, given the smaller population in the eighth housing block, would not result in exceeding the existing population cap. The request is granted, but subject to review in six months, upon notification to the court, no later than four months from now, that the City has a justifiable good faith need for continuing the arrangement. While the request adds only about eight beds to each cell block, bringing the count in each general population block to about 158, it has already been determined several times in this litigation both that "there can be no serious dispute" that keeping the population in each housing block to 150 is "essential for safety, effective supervision and to curb the tension, anxiety and violence which arise when the full block is at or near capacity," March 6, 1981 Order at 3, and that HDM has been unable adequately to support even its current population. *Benjamin,* 564 F.Supp. at 683.

### F. *Request to Temporarily Raise the House of Detention for Men Population Cap to 1480*

The request to temporarily increase the HDM population cap from 1200 to 1480 is denied.

> As this court noted just three years ago:
> In terms of maintenance, sanitation, medical care and even such essentials as food and security from assault, HDM

..., despite the vigorous efforts of [its] administrators, appear[s] unable adequately to support even [its] current level[] of population.

*Benjamin,* 564 F.Supp. at 683. Not only has the City failed to present any evidence that conditions at HDM have altered sufficiently to justify granting its request, but, to the contrary, even today, years after the entry of the decrees, conditions at HDM have never yet been in compliance with the decrees. While *Willowbrook* counsels flexibility, it does not sanction vacillation or constant reopenings of decrees. The issue of the appropriate population cap at HDM has been settled.

Submit proposed modification of decree on notice.

---

tions may well be better than those at City institutions. Katz Affidavit at ¶ 110. Finally, even if these propositions were not so, the critical fact remains that the alleged parole violators ought not be treated differently from other detainees, since the charges of parole violation standing against them are unproven, and in

many instances involve the very same charges as those for which they are substantively detained. *See generally Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (alleged parole violators have liberty interest in their parole within the protection of the Fourteenth Amendment).