James BENJAMIN, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, et
al., Defendants,

Ernesto MALDONADO, et al.,
Plaintiffs,

v.

William CIUROS, Jr., et al.,
Defendants.

DETAINEES OF the BROOKLYN
HOUSE OF DETENTION FOR
MEN, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, et
al., Defendants.

DETAINEES OF the QUEENS HOUSE
OF DETENTION FOR MEN, et
al., Plaintiffs,

v.

Benjamin J. MALCOLM, et
al., Defendants.

Iola FORTS, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, et
al., Defendants.

Nos. 75 Civ. 3073 (MEL), 76 Civ. 2854
(MEL), 79 Civ. 4913 (MEL), 79 Civ.
4914 (MEL) and 76 Civ. 101 (MEL).

United States District Court,
S.D. New York.

May 20, 1987.

Philip L. Weinstein, Theodore H. Katz, Jonathan S. Chasan, John A. Beck, The Legal Aid Society, New York City, for plaintiffs.

Peter L. Zimroth, Corp. Counsel of the City of New York, New York City, for defendants; Leonard Koerner, Paul Rephen, of counsel.

LASKER, District Judge.

On November 10, 1986, this court issued an order granting the City of New York limited, temporary relief from its order of June 23, 1981, which had imposed sixty-square-foot and fifty-person limitations on the dormitories in New York City correctional facilities. After considering the relevant decisions of *Lareau v. Manson*, 651 F.2d 96 (2d Cir.1981), *New York State Association for Retarded Children v. Carey*, 706 F.2d 956 (2d Cir.1983), and *Badgley v. Santacroce*, 800 F.2d 33 (2d Cir.1986), it was determined that

> it is constitutionally tolerable to allow inmates to be housed at forty square feet in the North Facility for a single fifteen day period on a temporary basis for a limited and definite period as an emergency measure, designed to give the City an additional period of time to cope with the current population crisis.

*Benjamin v. Malcolm*, 646 F.Supp. 1550, 1554 (S.D.N.Y.1986). It must now be determined how long this temporary relief will be allowed, and a date must be set by which time "the City must have an alternative plan which will conform with the consent decrees and may not expect or rely on further extensions," *id.* at 1555.

The City has now been allowed for almost seven months to house inmates in the

North Facility at forty square feet for a single fifteen-day period. Originally, the City stated that it would only need the North Facility relief until the end of December, 1986. Affidavit of Richard J. Koehler at ¶ 15 (Oct. 7, 1986). This estimate was then revised with a request that the North Facility relief be continued through April 1987, and then again from September through November 1987. Supplementary Affidavit of Richard J. Koehler at ¶ 20 (Nov. 18, 1986) ("Koehler Supplementary Affidavit"). This request was based on predictions of seasonal fluctuations in the size of the inmate population and on planned increases in housing capacity. In support of the request for further relief, the City submitted an affidavit alleging that overcrowding has not adversely affected conditions in the North Facility. Supplemental Affidavit of Richard J. Koehler (Mar. 30, 1987).

Plaintiffs, in opposition to the City's request, propose that the temporary North Facility relief be terminated by June 1, 1987. Affidavit of Theodore H. Katz at ¶ 6 (Apr. 15, 1987) ("Katz Affidavit"). They argue that by June 1 the City will have had eight months of relief from the population caps, a period of relief far longer than the seven-week grace period allowed in *Duran v. Elrod,* 760 F.2d 756, 761 (7th Cir.1985), one of the principal cases upon which the City relied when it originally requested relief.

In support of their position, plaintiffs have raised serious questions as to the validity of the City's assertions that the overcrowding at the North Facility has not had a negative effect on conditions there or elsewhere in the system. Plaintiffs' arguments raise substantial concerns that overcrowding has caused significant problems in many areas at the North Facility, including such basic services as the processing of new admissions, delivery of medical care, and access to commissary and meals. Katz Affidavit at ¶¶ 9–15. Plaintiffs have also cast doubt on the validity of the City's claim that incidents of violence have decreased at the North Facility and indeed have presented evidence indicating that the number of injuries at the North Facility may be increasing. *Id.* at 17–19. Even more grave, plaintiffs have convincingly argued that the overcrowding in the North Facility may have contributed to tension and strain in the New York City jail system as a whole, a system where violence is increasingly pervasive. *Id.* at 20–22.[1]

There is no argument but that the population caps must be reimposed and that the overcrowding at the North Facility must end. The only question for decision is when. The plaintiffs have indeed made a strong showing for the immediate reimposition of the population caps. However, as noted in the decision of November 10, 1986, in institutional reform litigation, where the public interest, as well as the interests of the parties, may be affected:

> judicially-imposed remedies must be open to adaptation when unforeseen obstacles present themselves, and to accommodation of a wider constellation of interests than is represented in the adversarial setting of the courtroom.

*Benjamin,* 646 F.Supp. at 1553 (S.D.N.Y. 1986) (quoting *New York State Association for Retarded Children v. Carey,* 706 F.2d 956, 969 (2d Cir.1983)).

In the case at hand, *Carey* requires consideration of the following factors. First, the City appears to be making good faith efforts to resolve the overcrowding problem voluntarily. It has embarked on a large-scale building program, although history—and the unforeseen delays and expense which have already plagued these construction projects—demonstrate the improbability of resolving this crisis by construction alone.[2] The City also appears to

---

**1.** Department of Corrections statistics show that there were 3,228 violent incidents reported in the New York City corrections system during the first three months of 1987, as compared to 2,934 for the same period in 1986. Katz Affidavit at ¶ 21; Martin, *Violence Grows in Crowded New York Jails,* N.Y. Times, Apr. 15, 1987, at A1, col. 2.

**2.** For instance, the New York Times has reported that the conversion of a ferry boat into a "prison boat," a project which was planned to

have substantially increased efforts to develop alternatives to pre-trial detention. It has budgeted $1.1 million for fiscal year 1988 to fund various new programs to further this goal, including hiring of a consultant to develop a population management plan for the City, doubling the VERA Community Service Sentencing Program and expanding the Criminal Justice Agency's Bail Expediting Program. Letter to the Court from Kevin B. Frawley, Mayor's Coordinator of Criminal Justice (Apr. 29, 1987). Moreover, the New York State Judiciary has announced an encouraging plan to schedule summer trials with the intention of preventing the usual buildup of jail population during July and August, when traditionally fewer trials have been held.[3]

Second, even though overcrowding at the North Facility must increase the strain on the New York City corrections system as a whole, the detainees housed at forty square feet in the North Facility, who are the most directly affected by the overcrowding there, may only be housed under those conditions for a single period of fifteen days.

Upon consideration of these factors, I conclude that the temporary relief at the North Facility may be continued until June 15, 1987 and thereafter for the period September 1 through November 30, 1987. The North Facility relief is disallowed from June 15 through August 31, 1987. The City has itself represented to the court that relief from the consent decrees would be required only from January through April 1987 and then again from September through November 1987. Koehler Supplementary Affidavit at ¶ 20 (Nov. 18, 1986). The temporary North Facility relief may be resumed from September through November 1987, because that is the period when the City has predicted that the inmate population will reach its annual peak. Id. at ¶ 19.

After November 30, 1987, no further requests for modification will be granted regardless of foreseeable or unforeseeable problems which may arise. Any further modification of the population limits would be inconsistent with the court's obligation to preserve plaintiffs' constitutional rights. The Court of Appeals for this circuit has made clear that in prison condition litigation "flexibility for the state, whatever its good faith, can ultimately only go so far. Unconstitutional conditions cannot be tolerated because constitutional requirements are difficult for the state to fulfill." *Lareau v. Manson*, 651 F.2d 96, 110 n. 14 (2d Cir.1981); *accord Benjamin*, 646 F.Supp. at 1550; *cf. Badgley v. Santacroce*, 800 F.2d 33, 36–39 (2d Cir.1986)(rejecting impossibility defense to compliance with jail consent decree).

Finally, the City has represented that it can maintain safety and order in the City's correctional institutions if the requested extension of the temporary increase in population is granted. The City must now fulfill its responsibility to do so.

It is so ordered.

take sixty days and cost 4.86 million dollars, actually took more than twice as long and cost almost twice that much. *See* Lambert, *City's Prison Boat is Late and Costly*, N.Y. Times, Mar. 24, 1987, at B8, col. 1.

**3.** *See* Hevesi, *New York is Urging Judges to Shift Vacations to Hear Criminal Cases*, N.Y. Times, May 14, 1987, at A1, col. 1.