James BENJAMIN, et al., Plaintiffs,

v.

Richard KOEHLER, et al., Defendants.

Charles FISHER, et al., Plaintiffs,

v.

Richard KOEHLER, et al., Defendants.

Ernesto MALDONADO, et al.,
Plaintiffs,

v.

William CIUROS, Jr., et al.,
Defendants.

DETAINEES OF THE QUEENS
HOUSE OF DETENTION FOR
MEN, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, et
al., Defendants.

Iola FORTS, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, et
al., Defendants.

Guy Zepth AMBROSE, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, et
al., Defendants.

DETAINEES OF THE BROOKLYN
HOUSE OF DETENTION FOR
MEN, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, et
al., Defendants.

Nos. 75 Civ. 3073 (MEL), 83 Civ. 2128
(MEL), 76 Civ. 2854 (MEL), 79 Civ. 4914
(MEL), 76 Civ. 101 (MEL), 76 Civ. 190
(MEL) and 79 Civ. 4913 (MEL).

United States District Court,
S.D. New York.

April 7, 1989.

Phillip L. Weinstein, Theodore H. Katz, Jonathan S. Chasan, John A. Beck, William J. Rold, The Legal Aid Soc., Prisoners' Rights Project, New York City, for plaintiffs.

Peter L. Zimroth, Corp. Counsel, New York City (Leonard Koerner, Asst. Corp. Counsel, of counsel), for defendants.

LASKER, District Judge.

Throughout the United States in large metropolitan areas, and now some smaller ones, the plague of cocaine-derived "crack" has prompted a substantial increase in criminal arrests. The result in New York City has been to swell the population of its correctional facilities. As a result, the City once again seeks modifications of this court's order of June 23, 1981 which imposes limitations on the number of inmates who can be housed in a dormitory and the square footage which must be afforded to each inmate for "living" purposes.[1] The City moves for an order allowing it, until June 15, 1989, to house detainees at the North Facility and the Rose M. Singer Center ("RMSC") at forty (rather than the existing sixty) square feet for a period not

---

1. Plaintiffs cross-move for specific injunctive relief for contempt of this court's order of April 13, 1981, that prohibited defendants from having inmates sleep in non-housing areas such as receiving rooms. This motion has not been answered and is not addressed in this opinion.

exceeding fifteen days for a particular inmate; and to house 58, rather than 50, detainees in each dormitory at the Correctional Institute for Men ("CIFM") and the Anna M. Kross Center ("AMKC"), for a period not to exceed fifteen days per inmate.

Such relief, on a temporary and then extended basis has previously been requested by the City on a nearly annual basis since 1981.[2] The legal standards set forth in an earlier opinion, *Benjamin v. Malcolm*, 646 F.Supp. 1550, 1552–54 (S.D. N.Y.1986), remain applicable. Two criteria articulated there govern evaluation of the present application:

First, did the rise in arrests caused by the "crack" epidemic constitute a new and unforeseeable condition sufficient to warrant modification of the decrees or does the City itself bear responsibility for failing to foresee the present overcrowding crisis?

Second, are the defendants' requested modifications, each of which must be tested separately, constitutionally acceptable or are they in derogation of the primary purpose of the decrees to ensure constitutionally minimal conditions for detainees?

*Id.* at 1554. In connection with the City's application the court and the parties visited the former Rikers Island Hospital, the North Facility and the RMSC on April 6th. The court was well-acquainted with the AMKC and CIFM as a result of earlier visits.

## I. FORESEEABILITY

The City argues for temporary modification of the decree in order to accommodate a 25 percent increase in the inmate population during the past year. The City admits that it foresaw a surge in arrests and new detainees resulting from the Police Department's Tactical Narcotics Team ("TNT") program and that "detailed plans were developed to accommodate the increased jail population."[3] But it argues that non-TNT arrests have increased significantly during the past year and that this increase was unforeseeable.[4] It also asserts that the State's reluctance promptly to accept parole violators whose hearings have been completed, as well as recently enacted legislative restrictions on the eligibility of inmates to participate in supervised detention programs, have contributed to the rise in population.[5]

In affidavits in support of its application and during argument, the City has demonstrated its good faith efforts to accommodate the significant growth in inmate population through additional construction, the use of barges and other temporary facilities, budget increases for expanded alternatives to incarceration, and other measures. Ironically, however, these positive initiatives also demonstrate that the growth in inmate population was foreseeable. In addition, the City's plans to accommodate the increase were in some instances facially inadequate;[6] their failure does not merit relief.

Moreover, as plaintiffs persuasively argue, the 25 percent increase in prison population during the past year has been close to City projections and not inconsistent with past periods of high increases.[7] Specifically, the non-TNT increase in population during the past year has been approximately 19 percent, less than a comparable

2. The City has requested relief or extensions of relief on at least eight occasions since 1981. This court has granted such requests in five instances. Affidavit of Theodore H. Katz at ¶¶ 68–86 (April 7, 1989) ("Katz Affidavit").

3. Affidavit of Peter J. Benitez, Coordinator of Criminal Justice of the City of New York, at ¶ 40 (March 30, 1989) ("Benitez Affidavit").

4. Benitez Affidavit at ¶ 58. According to the City, the number of non-TNT arrests increased by 6.7 percent during the fourth quarter of 1988 as compared to the fourth quarter of 1987. Non-TNT felony arrests increased by 10.2 percent during the same period. *Id.*

5. Affidavit of Richard J. Koehler, Commissioner of the New York City Department of Correction, at ¶¶ 11–12 (March 30, 1989).

6. Katz Affidavit at ¶¶ 94–95.

7. Katz Affidavit at ¶ 93.

increase of 20 percent in 1985–86[8] about which this court stated:

> The City cannot evade the fact that it bears a significant share of responsibility for the current crisis in its jails. ... [T]he City has consistently underestimated the projected jail populations and continued to do so even after the "crack" crisis commenced.

*Benjamin v. Malcolm,* 646 F.Supp. 1550, 1554 (S.D.N.Y.1986). The presence of excess parole violators and other categories of State inmates in the City prisons is lamentable but was certainly foreseeable; it has been consistently cited as a problem by the City during previous requests for relief.[9] As to legislative restrictions on the implementation of the supervised detention program, these were announced approximately one year ago and are thus not unexpected.[10] In sum, the City must accept the responsibility for dealing with the increase in population.

## II. CONSTITUTIONAL ACCEPTABILITY

As indicated above, a defendant seeking modification of a decree, even in circumstances of institutional reform litigation where such modification is considered on a more flexible and generous basis, bears the burden of establishing that the relief requested will further, rather than frustrate, the purposes of the decree. In this case that burden is made heavier because, in spite of the efforts of the parties and continual monitoring and prodding by the Office of Compliance Consultants ("OCC") (the agency specifically established to assist in bringing about compliance with the decrees) such compliance has not been accomplished in full at any of the four institutions in question during the eight year period that the decrees have been in existence.

### A. North Facility[11]

Two years have passed since relief of the very nature now requested for the North Facility was granted. In the interim, North's population has been increased by the "addition" of an annex, two ferries, and, most recently, conversion of the former Rikers Island Hospital essentially into a receiving room, all of which depend on the North Facility for essential services other than housing. In 1986, the relief granted authorized a maximum population of 1779, although, in fact, it rarely exceeded 1500. The City now asks to house as many as 2200 inmates at the North Facility.[12]

Such numbers must inevitably strain the troubled service delivery at the North Facility. Plaintiffs contend, and defendants put no evidence before us to the contrary, that the "facility already appears to be short medical staff, social service staff, and mail staff, and uniformed staff is working on excessive overtime,"[13] an appearance confirmed in part during the visit by the reports of inmates and the clinic's chief physician. The latter, a member of the staff of Montefiore Hospital, characterized the institution as being medically at the breaking point, because of the limited space and staff in relation to the number of inmates presently at the facility.[14] In particular, he spoke of his inability to provide adequate medical care and predicted a possible escalation of violence in the North Facility because of the pending "crisis." The defendants represent that, if the relief requested is granted, sufficient resources will be expended to ensure adequate services, but these assurances are too general in nature to give confidence that the enormous problems which an increase in population would aggravate can be successfully

---

**8.** *Id.*

**9.** Katz Affidavit at ¶ 97.

**10.** Katz Affidavit at ¶ 96.

**11.** The evaluation of the North Facility and the RMSC reflects not only the facts presented in the parties' affidavits, but also the court's impressions gleaned from yesterday's visit to those institutions.

**12.** Katz Affidavit at ¶ 119.

**13.** Katz Affidavit at ¶ 127.

**14.** The court's introduction to the physician indicates the full and candid presentation of facts given by the Department of Correction ("the Department"), for which it is to be commended.

overcome. Moreover, even in 1986, after "temporary relief" had continued for seven months, there were "substantial concerns that overcrowding [had] caused significant problems in many areas at the North Facility...." *Benjamin v. Malcolm*, 659 F.Supp. 1006, 1007 (S.D.N.Y.1987). In addition, physical observation of a North dormitory in which sentenced inmates were housed at forty-square feet[15] (the space detainees would be allotted were the requested relief to be granted) demonstrated that living in such limited space—less than six feet by seven feet—even for only fifteen days, would constitute a constitutional hardship. This would be especially true in the cases of large numbers of inmates who will just have come from court pens and receiving rooms where they have been sleeping on the floors, with or without mattresses, for up to two or three days. It is true that the Department is making significant efforts to overcome the receiving room deficiencies, but at present their condition is a very real factor in the situation.

### B. RMSC

The requested relief at RMSC, the women's facility, would affect only the portion of the building formerly designated the Correctional Institution for Women ("CIFW"). In 1986, a similar request for relief at CIFW was denied, on the ground that then existing delays in service delivery should not be aggravated. *Benjamin*, 646 F.Supp. at 1555. The conclusions made with respect to the North Facility, as to the largely uncontroverted facts reflecting present problems in service delivery, *see* Katz Affidavit at ¶¶ 143–50, the failure of the defendants to provide more than a generalized plan as to service delivery for an increased population, and observations of the conditions in an RMSC dormitory in which inmates are already squeezed are equally applicable to the RMSC.

**15.** Because sentenced inmates are not covered by this court's existing decrees, the square footage afforded them may be reduced without this court's permission.

**16.** OCC Report on Unit Management at 1 (September 14, 1988) (characterizing its April, 1988 report).

### C. AMKC

The request for relief at AMKC cannot be granted. This largest of the Rikers Island institutions has been one of the most troubled. As recently as April, 1988 OCC catalogued existing problems at AMKC. The report

delineated a host of compliance problems in the receiving room, kitchen, medical clinic, law library and mail room, in addition to serious physical plant problems that appeared to be long-standing: filth and vermin; broken windows, showers and toilet facilities; missing ceilings and floor tiles; inoperable lights and hot water dispensers; and excessive temperatures—either too hot or too cold.[16]

There is no significant evidence that this serious complex of deficiencies has been alleviated. OCC's report recommended that AMKC be divided into two facilities or that it institute unit management, neither of which has yet been accomplished. To increase the population would only exacerbate existing problems and would hardly further the purposes of the existing decree. This court's statement in 1983, made in the context of denying the defendants' motion to modify the population limit in AMKC, then 1900, is, unhappily, equally applicable today:[17] "[T]here is a limit to the number of inmates that these facilities can house in a constitutionally acceptable manner, and that ... limit has already been reached." *Benjamin v. Malcolm*, 564 F.Supp. 668, 685 (S.D.N.Y.1983).

### D. CIFM

Finally, the prospect of modifying the decree's population limit for dormitories at CIFM is unacceptable. Less than a year ago, the violence at CIFM among inmates and between inmates and staff was held to have reached proportions that violate the Eight Amendment's prohibition against cruel and unusual punishment.

**17.** In 1983, the population at AMKC was approximately 1900; because of additions to the facility, its capacity now exceeds 2800. Katz Affidavit at ¶¶ 154–55.

Systematic deficiencies in the operation of CIFM, most significantly, overcrowding, overreliance on open dormitory housing, lack of adequate classification, inadequate staffing and supervision ... have led to a world where inmates suffer physical abuse, both by other inmates and by staff, in a chillingly routine and random fashion.

*Fisher v. Koehler,* 692 F.Supp. 1519, 1521 (S.D.N.Y.1988). It would be irresponsible for the court, absent a demonstration that the situation were substantially improved and adoption of a decree setting forth the conditions for satisfaction of the constitutional standards, to authorize additional population in open dormitory housing in this institution.[18]

\* \* \* \* \* \*

The denial of the City's application should not be construed as minimizing the problem which the City faces but rather as a determination that that problem cannot again be solved at the expense of the people it holds in custody. As the Court of Appeals stated in the case upon which the City principally relies:

> [F]lexibility for the state, whatever its good faith, can ultimately only go so far. Unconstitutional conditions cannot be tolerated because constitutional requirements are difficult for the state to fulfill.

*Lareau v. Manson,* 651 F.2d 96, 110 n. 14 (2d Cir.1981) (citation omitted).

The emergency which the City faces does not, for example, authorize the holding of 75 male prisoners in a receiving room with one toilet, insufficient benches and chairs, and often without mattresses to sleep on, for as much as two to three days. Nor can that problem be solved by requiring prisoners to live within forty square feet for two weeks. Indeed, the time has come for the City to accept the fact that the court cannot consciously provide a solution to its chronically recurring problem.

As is exemplified by recent statements of the Chief Judge of the State of New York and the District Attorney of New York County as to the difficulties caused to their respective domains by the increased arrests in New York City,[19] the crisis facing the City cannot be solved by the court. Above all, the denial of relief in this case should not be construed to mean that the Commissioner of Correction is not applying all of his talents and energy to the solution of an unprecedented challenge.

The defendants' motion is denied.

It is so ordered.

---

**18.** Similar relief was requested and denied in November, 1988.

**19.** *See* Katz Affidavit at Exhibit 18 (Pitt, *Surge in New York Drug Arrest Sets Off Criminal–Justice Crisis,* N.Y. Times, Apr. 4, 1989, at B1, col. 1) ("New York City's criminal-justice system is in a state of crisis, just barely able to cope with a growing flood of new drug cases generated by the Police Department's drive against crack."); Katz Affidavit at Exhibit 19 (Wise, *Flip Side of Anti–Drug Drive is Understaffed Court System,* N.Y.L.J., Mar. 23, 1989, at 1, col. 1) (discussing remarkable stress that citywide implementation of TNT has placed on criminal-justice system).