730 F.Supp. 987 (1989)
Kenneth G. CHARRON, Sr., Plaintiff,
v.
The MEDIUM SECURITY INSTITUTION, et al., Defendants.
No. 86-1865 C(3).
United States District Court, E.D. Missouri, E.D.
April 28, 1989.
*988 *989 Kenneth G. Charron, Sr., Jefferson City, Mo., pro se.
Randall E. Gusdorf, Sachs and Miller, St. Louis, Mo., Court-appointed, for plaintiff.
Brian S. Witherspoon, Sheryl Johnson, Associate City Counselor, St. Louis, Mo., for defendants.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court to determine the merits of plaintiff's claims after a one and a half day trial before the Court sitting without a jury.
Plaintiff, a Missouri state prisoner now serving one life sentence plus thirty years for forcible rape, second degree robbery, and second degree burglary, brings this cause of action under 42 U.S.C. § 1985(3) (Count V); and, pursuant to 42 U.S.C. § 1983, claims violations of (a) his eighth and fourteenth amendment rights to be free from cruel and unusual punishment (Count I); (b) his fourteenth amendment rights to due process (Count II) and equal protection (Count IV), as well as his fifth amendment right to due process (Count II); (c) his first and fourteenth amendment rights to free speech and association (Count III); and (d) his thirteenth amendment right to be free from involuntary servitude and fourteenth amendment rights with respect to a requirement that plaintiff work in the workhouse kitchen (Count VI).
In general, plaintiff asserts he was a pretrial detainee at the city workhouse from August 21, 1984, to December 6, 1984, and as such was assigned to the workhouse kitchen as "potwasher" under the supervision of William Collee. On September 9, 1984, the allegedly unstable kitchen sink slid off its support and injured plaintiff. Plaintiff was taken by ambulance to St. Louis City Hospital where he was examined by x-ray and otherwise, received stitches, was given crutches and pain medication, and was directed to participate in physical therapy. Plaintiff alleges that thereafter, defendants arbitrarily and capriciously deprived plaintiff of the prescribed medication, the prescribed therapy, the prompt attention of a physician, sick call, and a return to the hospital.
Approximately one and one-half months later, plaintiff alleges, William Collee ordered plaintiff to return to work. Upon plaintiff's refusal to obey defendant Vada Anderson's direct order that plaintiff work as a "potwasher," defendant Anderson ordered plaintiff to "report to the `hole' (punitive segregation)," where plaintiff allegedly remained for six days without a hearing. During this six-day period, plaintiff was allegedly denied sick call, visits, phone calls, writing materials, access to the law library, and, thus, access to the courts. Plaintiff further alleges that as a white resident of the workhouse, he was subjected to "arbitrary and invidious treatment by [predominantly black] workhouse personnel due to his race." Plaintiff generally alleges all defendants conspired to deprive plaintiff of his federally protected rights. Plaintiff specifically alleges only defendants Claude Woodson, Maurice Harris, Herbert Casey, Jeanette Arnold, Phillip McLucas, Paul Berra, Madeline Percich, Edward Thomas, Vada Anderson, Jean Caramana, and Mark Blumenthal are involved in the conspiracy under 42 U.S.C. § 1985(3). *990 Plaintiff also generally alleges that defendants' acts and omissions were due to official "policies, rules, regulations and customs."
Having carefully considered the pleadings, trial testimony, exhibits, admissions, and memoranda, the Court makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. During all times relevant to this action, plaintiff Kenneth G. Charron, Sr., was a pretrial detainee at the Medium Security Institution of the City of St. Louis ("workhouse") from August 21, 1984, to December 6, 1984.
2. Defendant City of St. Louis was in 1984, and is currently, a municipal corporation, duly existing according to law. The City of St. Louis maintained the workhouse to preserve the safety of its citizenry, inmates, and detainees.
3. Defendant Division of Adult Correctional Services of the City of St. Louis was a sub-agency of the City in 1984. The responsibilities of this agency included the general welfare of the residents housed in the workhouse.
4. Defendant Department of Welfare of the City of St. Louis operated a Division of Adult Correctional Services and Adjustment Committee in 1984.
5. Defendant Medium Security Institution of the City of St. Louis, Missouri, is a penal institution. The responsibilities of this institution included providing shelter, safety, protection, and medical care for the detainees and prisoners housed in the institution.
6. Defendant St. Louis Department of Health was an agency of the City of St. Louis. The responsibilities of this agency in 1984 included the enforcement of the City's health and safety code within the workhouse in order to provide for the safety of the detainees and prisoners.
7. At all times relevant to this action, defendant Charles O'Neal was a food service health inspector for the St. Louis Health Division-Food Control Service. O'Neal was responsible for periodic inspections of the kitchen equipment and reporting violations to the workhouse for compliance with the City's health and safety code.
8. At all times relevant to this action, defendant Commissioner Edward Tripp was the Commissioner of Adult Correctional Services of the City of St. Louis, and was employed by the City of St. Louis, Missouri. The Commissioner's job description is defined as being:
Under administrative direction; performs work of unusual difficulty in planning, organizing, and directing the operation and maintenance of City penal institutions.
The Commissioner has
[c]omprehensive knowledge of the principles, methods, and techniques of penal institution management and parole and probation work; comprehensive knowledge of the legal requirements and court procedures pertaining to penal institutional work.
9. At all times relevant to this action, defendant Maurice Harris was the building maintenance supervisor of the Medium Security Institution and Correctional Work Program supervisor. His responsibilities included the maintenance and upkeep of the workhouse and the work equipment in a satisfactory operating condition. All notifications and requests for needed repairs at the workhouse were to be directed to Harris, and he was responsible for the requested repairs and maintenance.
10. At all times relevant to this action, defendant Dr. Mark Blumenthal was the official physician for the workhouse, and his duties included the medical treatment and medical welfare of the detainees and prisoners. Blumenthal also supervised the dispensing of prescription drugs by and through the nurses under his supervision.
11. At all times relevant to this action, defendant Jean Caramana was the head nurse of the workhouse, and she was responsible, in conjunction with the jail physician, for the medical care of plaintiff while at the workhouse.
*991 12. At all times relevant to this action, defendant Lieutenant Herbert Casey was an employee of the City of St. Louis as a jailer at the workhouse and a Correctional Officer I. His responsibilities included providing for the safety and care of the detainees and prisoners at the workhouse.
13. At all times relevant to this action, defendant Vada Anderson was an employee of the City of St. Louis as a jailer at the workhouse and a Correctional Officer I. Her responsibilities included providing for the safety and care of the detainees and prisoners.
14. At all times relevant to this action, defendant Madeline Percich was the supply commissioner in charge of purchasing and distributing supplies to the departments, and an employee of the City of St. Louis.
15. At all times relevant to this action, defendant Phillip McLucas was an employee of the City of St. Louis as a shift supervisor and captain at the workhouse.
16. At all times relevant to this action, defendant Oscar Bennett was the Chairman of the Adjustment Committee.
17. At all times relevant to this action, defendant David Kovac was a member present of the Adjustment Committee, and his responsibilities included being in charge of disciplinary action and control of residents housed in the workhouse.
18. At all times relevant to this action, defendant Elizabeth Smith-White was a member present of the Adjustment Committee, and her responsibilities included being in charge of disciplinary action and control of residents housed in the workhouse.
19. At all times relevant to this action, defendant Captain Edward Thomas was an employee of the City of St. Louis. His responsibilities as a jailer included the safety and care of the residents housed at the workhouse.
20. At all times relevant to this action, defendant Paul Berra was an officer of the City of St. Louis. His responsibilities included disbursing funds from the Comptroller's Office to City departments.
21. At all times relevant to this action, defendant Jeannette Arnold was a caseworker employed by the City of St. Louis at the workhouse.
22. At all times relevant to this action, defendant Claude Woodson was the correctional superintendent of the workhouse, employed by the City of St. Louis. His responsibilities included managing and operating the workhouse and the safety of the residents housed in the workhouse.
23. At all times relevant to this action, William Collee was the area coordinator-steward at the workhouse and an employee of the City of St. Louis. His duties included the supervision of all areas of operation in the kitchen of the workhouse. Collee was originally a named defendant in this cause. Upon his death, he was dismissed from this action.
24. The resident work program for the workhouse provides that a pretrial detainee is not required to work, but may work on his own volition and may request a change of job. A pretrial detainee may stop working at any point in time. Although a pretrial detainee is supposed to fill out an application for employment and be approved for employment, the practice at the workhouse was that not all pretrial detainees who were employed had filled out applications. As a result of plaintiff's institutional social service file from the workhouse not being located, there is no evidence concerning whether plaintiff filled out an employment application. Plaintiff was issued a work badge so that he could work in the kitchen at the workhouse.
25. Plaintiff testified he was offered a job in the kitchen by Collee, and that he worked as a potwasher for a couple of weeks before being injured when the sink fell on him on September 9, 1984.
26. Plaintiff further testified that while he was refilling the sink with water, the sink slid off its supports, falling on top of plaintiff's left leg and pinning him to the floor. At the time of plaintiff's injury and prior to that time, the kitchen sink at the workhouse did not have any legs but was supported on one side by bricks and on the other side by a cooking pot, and the back of *992 the sink was leaning against the wall but was unattached to the wall. The sink also did not have any drain piping. Defendants O'Neal, Casey, Harris, and Tripp testified as to the state of disrepair of the sink and how the sink was propped up on containers or milk crates and not attached to the wall.
27. The top of the sink was waist high, with the bottom part of the sink eighteen to twenty-four inches above the ground. The sink was approximately six feet long and two feet wide. The compartments on the sink could hold about one hundred gallons of water.
28. Since January 17, 1984, defendant O'Neal reported on numerous occasions in the health division reports received by the St. Louis Department of Health, that the pot washing sink was not properly constructed, designed, and maintained and needed to be replaced, and that the waste water from the pot washing sink was not being properly disposed but drained on to the floor as a result of no drain piping. O'Neal testified that he informed Collee, Harris, and Tripp of the state of disrepair of the sink.
29. Tripp was aware of the condition of the sink prior to plaintiff's injury which was sustained in early 1984 as a result of the sink falling on him. Tripp discussed with Harris the sink's state of disrepair and the need to replace the sink. Harris testified he informed Collee that the sink should not be used because the sink was unstable and needed to be replaced.
30. Tripp reported the condition of the sink to the Board of Public Service in early 1984 and requested funds for a replacement sink. This request was then channeled to the Comptroller's Office for emergency funding. The sink was not repaired until after plaintiff's accident. The record reflects that the cost of repairing or replacing the sink was a factor in determining when and whether the sink would be repaired or replaced.
31. Immediately after the accident, plaintiff was transported by ambulance to the emergency room at St. Louis City Hospital No. 1, where he received thirty-two stitches in his left knee for lacerations. The doctor advised plaintiff not to do any heavy lifting for five or six days and prescribed Tylenol and Motrin for plaintiff.
32. Although plaintiff alleges he was denied sick call and medication, the record reflects he was seen by a doctor or a nurse on a number of occasions between September 10, 1984, and October 24, 1984. On two occasions, plaintiff refused to see the doctor, and on one occasion plaintiff refused medication. On September 10, 1984, the day after the accident, plaintiff was seen during sick call in the workhouse, at which time plaintiff's sutures were checked and he was given a prescription for Motrin. On September 28, 1984, plaintiff went to the hospital for a neurological examination of his arm. Plaintiff's next visit was on October 22, 1984, and he complained of an ear ache and drainage, but on October 23, 1984, he failed to appear for sick call. On October 24, 1984, plaintiff was present for sick call and was scheduled to go to the clinic. On October 29, 1984, plaintiff was taken to the hospital for an ear examination. On November 19, 1984, plaintiff went to the hospital's ear, nose, and throat clinic. Plaintiff's last visit to the hospital before his release from the workhouse was on December 3, 1984, when he complained of having the flu.
33. Plaintiff testified that on October 26, 1984, Collee noticed plaintiff no longer was walking with crutches and ordered plaintiff back to work. Plaintiff reported to the kitchen only to discover that the sink had not been repaired but had been propped up on a wooden platform. Plaintiff refused to work under those conditions, and offered to work at another position in the kitchen, but Collee ordered plaintiff to work as a potwasher and threatened to report him for refusing to work. Plaintiff decided to terminate his employment and he turned in his badge before leaving the kitchen.
34. At approximately 4:30 p.m. that same day, plaintiff was called back to the kitchen, and when questioned concerning his refusal to work, plaintiff stated that he had a lot on his mind and so he could not work. Ms. Anderson testified she gave *993 plaintiff a direct order to work, and when he refused to work she stated plaintiff would be placed in segregation because of his refusal to obey her direct order.
35. Lieutenant Casey escorted plaintiff to segregation after Ms. Anderson informed Casey of plaintiff's refusal to work. Casey testified plaintiff indicated to him that he was concerned about being a potwasher and was unwilling to work at that time because he was not completely healed from the accident. Casey testified that since this incident occurred during meal time, Casey viewed the incident as a potential security risk because such a confrontation of authority by a resident could jeopardize the staff's ability to control the residents.
36. The incident report concerning plaintiff's refusal to work lists this occurrence as a minor incident, with the penalty for this violation ranging from assignment to administrative control to loss of good time and assignment to segregation for a maximum of ten days, as outlined in the resident discipline code.
37. The incident report provides the following description of plaintiff's refusal to work:
On 10-26-84 ar [sic] approximately 4:35 p.m. I C/O Vada Anderson was informed by a resident working the kitchen that resident Kenneth Charron had turned in his badge and quit his job. The resident Charon [sic] was called back to the kitchen and he said that he had a lot on his mind and he couldn't work anywhere. It seems that in his condition he would be a security threat in the kitchen area.
The statement of the investigating supervisor signed by Phillip McLucas indicates that the "above statement is accurate [and] resident Charron stated that he had a lot on his mind and dis [sic] not want to work at this time."
38. After being placed in segregation, a hearing by the Adjustment Committee is to occur within seventy-two hours of a resident being placed in segregation. Weekends and holidays are excluded from the seventy-two hour time period. The hearings are held on Monday, Wednesday, and Friday, and if a resident misses a hearing day because of his need for medical care, he has to wait until the next available hearing day. Although plaintiff was placed in segregation on a Friday, his hearing was not until the following Wednesday because he missed the scheduled hearing on Monday as a result of his being at the hospital.
39. Plaintiff pled not guilty to the charge in the incident report. One member of the Adjustment Committee testified that plaintiff told the committee that he decided not to work because he had many problems on his mind. At the hearing, this member testified, there was no evidence presented showing plaintiff to be a security threat or violent during this particular incident. This member further testified, however, that, at times, plaintiff could be a very nasty individual to the staff and other residents. The Adjustment Committee found plaintiff not guilty on October 31, 1984, without stating any reasons for its finding on the incident report.
40. The record reflects that no distinction is made by the employees of the workhouse between a sentenced resident and a pretrial detainee, nor is there a means by which to distinguish the two types of residents. The policy of the workhouse is to put a resident into segregation if the resident refuses to work, after being given a direct order to work, because this refusal to work is tantamount to refusing to obey a direct order given by a staff person. If a resident has applied for a job and is assigned to a job, he cannot refuse to work if he is directed to work by the person in charge of the area. Failure to comply with the direct order will result in placement in segregation. If a resident wants to terminate his employment, he must contact his assigned social worker who would prepare the proper paperwork.
41. Commissioner Tripp testified as to segregation. When a resident is placed in segregation for refusal to work, the resident is segregated until the resident's hearing before the Adjustment Committee, where the resident's status is then determined. Commissioner Tripp explained that *994 the officer who is at the scene of the refusal determines whether the refusal constitutes a security matter. He noted that a resident may refuse to work, and if the resident is not then ordered to work, the resident is sent back to his dormitory. However, if the resident is performing a job that is essential to the security of the workhouse, and the resident refuses to work, the officer in charge of the area will give the resident a direct order to work. If the resident refuses to obey the officer's direct order to work, the resident will be placed in segregation. Commissioner Tripp further testified that he views the position of potwasher as being essential to the security of the workhouse.
42. Protective segregation may be ordered for the protection of the inmate himself from other residents at the facility.
43. If a resident is housed in segregation, he is able to have scheduled booth visits, as is the general population, unless directed otherwise by the superintendent or chief of security (Administrative Order No. 17, dated January 9, 1985). Access to legal counsel is to be no different if a resident is housed in segregation or in the general population. Mail privileges are to be the same as the general population, with the exception of newspapers and magazines.

Conclusions of Law
A. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983.
B. Plaintiff seeks to establish a claim under the eighth and fourteenth amendments by proving he was subjected to cruel and unusual punishment. The Court finds, however, that to the extent plaintiff was a pretrial detainee at all times relevant to this action, plaintiff is not subject to the cruel and unusual punishment standard applicable to a prisoner who has been convicted of a crime. Bell v. Wolfish, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979). The Court construes that claim as a claim for violation of plaintiff's due process rights to the extent plaintiff was a pretrial detainee. See id. In evaluating the constitutionality of conditions or restrictions imposed on pretrial detainees, the proper inquiry is whether those conditions amount to punishment of the detainee or otherwise violate the Constitution. Id. at 535-37, 99 S.Ct. at 1871-73. The Supreme Court recognized this distinction in Ingraham v. Wright, 430 U.S. 651, 671-72 n. 40, 97 S.Ct. 1401, 1412-13 n. 40, 51 L.Ed.2d 711 (1977):
Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. See United States v. Lovett, 328 U.S. 303, 317-318 [66 S.Ct. 1073, 1079-80, 90 L.Ed. 1252] (1946).... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.
C. Pretrial detainees do not stand on the same footing as convicted inmates. If pretrial detainees are subjected to restrictions and privations other than those inherent in their confinement itself or which are justified by compelling necessities of jail administration, this is a violation of the due process and equal protection clauses of the fourteenth amendment. Ahrens v. Thomas, 434 F.Supp. 873, 897-98 (W.D.Mo.1977).
D. The imposition of maximum security confinement of detainees when it is not necessary violates their rights to due process and to be free from cruel and unusual punishment by punishing them although they are unconvicted, and violates their rights to equal protection of the laws by unnecessarily treating them more harshly than those convicted.
Id. at 898.
E. Here, plaintiff, a pretrial detainee, was subjected to conditions which may be considered punitive. The Court finds *995 that plaintiff did not pose a threat to security under the given circumstances because earlier that day, plaintiff had turned in his work badge and left the kitchen area. Plaintiff was placed in segregation for allegedly refusing to work, even though, as a pretrial detainee in the workhouse, he was not required to work. Plaintiff testified he had not been working during the day of the incident in question, but that he had refused to work when he discovered the sink had not been repaired or replaced. After refusing to work in those conditions and offering to work at another position, plaintiff turned in his badge and left the kitchen. After plaintiff was called back to the kitchen and refused a direct order to work, Lieutenant Casey placed plaintiff in segregation after shift supervisor McLucas authorized plaintiff's being placed in segregation by signing the incident report. After the Adjustment Committee found plaintiff not guilty, plaintiff was released from segregation. While the Adjustment Committee did not state its reasons for finding plaintiff not guilty, one of the committee's members testified at trial that there was no evidence presented showing plaintiff to be a security threat or violent during this particular incident. Defendants' action of placing plaintiff in segregation was a restriction not reasonably related to a legitimate goal or purpose; in other words, it was arbitrary or purposeless. Therefore, the Court permissibly may infer that the purpose of the action was punishment that may not constitutionally be inflicted upon pretrial detainees. Bell, supra 441 U.S. at 539, 99 S.Ct. at 1874. Accordingly, the Court finds that plaintiff's placement in segregation amounted to punishment in violation of his due process rights.
F. To recover damages on his constitutional claim, plaintiff must establish defendants are not entitled to qualified immunity from civil damages liability. "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the `objective legal reasonableness' of the action, assessed in light of the legal rules that were `clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The relevant question here is the objective question whether a reasonable penal institution staff member could have believed defendants' conduct was lawful, in light of the clearly established law and the information defendants possessed. Id. 107 S.Ct. at 3038-40. Qualified immunity is an affirmative defense that must be pleaded by a defendant official. Harlow v. Fitzgerald, 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982).
G. As a result of the workhouse staff's custom of not distinguishing between pretrial detainees and prisoners residing in the workhouse, the staff members had no means of knowing whether a resident was a pretrial detainee or a prisoner. Since, during the time period relevant to this action, the law was clearly established that the unnecessary imposition of security confinement on a pretrial detainee violates the detainee's rights to due process, the immunity defense fails because a reasonably competent prison official should know the law governing his conduct. Defendants failed to adduce any evidence establishing that they did not know nor should have known of the relevant legal standard so that extraordinary circumstances could not be claimed by defendants. Id. at 819, 102 S.Ct. at 2738. Defendants could be expected to know that certain conduct would violate statutory or constitutional rights of pretrial detainees housed in the workhouse. Defendants consequently are not entitled to qualified immunity because it is clear that a reasonable penal institution staff member would know the conduct in question violated a pretrial detainee's constitutional due process rights. Accordingly, defendants Medium Security Institution of St. Louis, Edward Tripp, Phillip McLucas, Herbert Casey, and Vada Anderson are individually liable for violating plaintiff's due process rights since their actions were not reasonable in light of the legal rules that were clearly established at the time relevant to this action.
*996 H. The Court of Appeals for the Eighth Circuit has recognized "that a local government entity may be amenable to suit under § 1983 for a continuing failure to remedy a known pattern of constitutionally offensive conduct by its subordinates." Baker v. McCoy, 739 F.2d 381, 384 (8th Cir.1984); Herrera v. Valentine, 653 F.2d 1220 (8th Cir.1981) (city held liable for failure to supervise its overzealous police force). To sustain such a claim, plaintiff must show that the governmental body had notice of prior misbehavior, that with deliberate indifference to further constitutional violations it failed to act, and that such failure to act proximately caused the injury. Baker, supra at 384. Here, however, plaintiff did not offer evidence establishing a pattern of similar incidents constituting constitutional violations, and consequently, plaintiff failed to make a submissible case showing how defendants failed "to remedy a known pattern of constitutionally offensive conduct." Id. Accordingly, plaintiff does not set forth a claim for recovery against any of the named defendants.
I. To succeed on his claim for inadequate medical treatment under 42 U.S.C. § 1983, plaintiff must prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Deliberate indifference can be manifested by an intentional denial of or delay in providing access to medical care. See id. at 104-05, 97 S.Ct. at 291-92. Negligence on the part of the physician in diagnosing or treating a medical condition or medical malpractice does not violate the eighth amendment. Id. at 106, 97 S.Ct. at 292. A showing of an indifference to serious medical needs constitutes "an unnecessary and wanton infliction of pain" under the eighth amendment. Id. at 105-06, 97 S.Ct. at 291-92.
J. Here, the record evinces no deliberate indifference to plaintiff's serious medical needs by any of the medical personnel or staff at the workhouse. During the relevant time period, plaintiff was seen by a doctor or a nurse on a number of occasions between September 10, 1984, and October 24, 1984. On two occasions plaintiff did not attend sick call. On another occasion he refused medication. In light of the record before the Court, plaintiff fails to state a cognizable 42 U.S.C. § 1983 claim upon which relief can be granted. Plaintiff also fails to ascribe any specific acts to Dr. Blumenthal or to Jean Caramana, the head nurse.
K. Plaintiff seeks to establish a claim based upon 42 U.S.C. § 1985 by proving "defendants ... acted in concert to deprive plaintiff of his federally protected rights, where such deprivation was the proximate cause of damages sustained by plaintiff." To succeed on his claim under § 1985(3), plaintiff must establish he was a member of a class suffering from invidious discrimination and that defendants' conduct included purposeful, class-based discrimination. Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). Plaintiff did not make such allegations demonstrating such membership or establishing such discrimination. Accordingly, plaintiff did not prove a claim under § 1985(3).
L. Plaintiff further seeks to prove a claim under the thirteenth and fourteenth amendments as a result of being forced to work involuntarily in the workhouse kitchen. Plaintiff adduced no evidence at trial concerning this claim. The only evidence offered established that plaintiff was approached by defendant Collee who offered plaintiff a job in the kitchen as a potwasher. Although a pretrial detainee is supposed to fill out an application for employment and be approved for employment, the practice at the workhouse was that not all pretrial detainees who were employed had filled out applications. Plaintiff has not directed the Court to any policy or practice of the workhouse from which liability could attach. Plaintiff has failed to state a claim upon which relief can be granted by not adducing any evidence that he was forced to work involuntarily. The Court will not further address this claim because the Court finds, from the record presented to *997 the Court, that plaintiff was not forced to work against his will.
M. Plaintiff seeks to prove a claim under the fourteenth amendment by establishing he was denied equal protection as a result of being "subjected to arbitrary and capricious enforcement of the policies, rules, regulations, and customs of the workhouse. Plaintiff was arbitrarily and capriciously subjected to invidious and malicious punishment without due process." To establish a claim for a violation of his right to equal protection of the laws, plaintiff must establish that some official workhouse rule, activity, or policy is discriminatory on the basis of race. Bentley v. Beck, 625 F.2d 70 (5th Cir.1980). Plaintiff does not make such allegations demonstrating such discrimination. Accordingly, plaintiff's claim under the equal protection clause of the fourteenth amendment is not persuasive.
N. To succeed on his claims for violation of his first amendment and fourteenth amendment rights, plaintiff must establish he was denied adequate and meaningful access to the courts, his mail, contact visits, writing materials, and to the telephone while in segregation. Plaintiff failed to adduce any evidence in support of his claims, except for his testimony at trial, that he was denied these rights. Plaintiff offered no evidence in support of his claims that he was denied adequate and meaningful access to the courts, writing materials, his mail, and the telephone while in segregation. Although while in segregation plaintiff was denied a contact visit, residents are not permitted contact visits during the time they are housed in maximum security. Visitation privileges fall within the discretion of prison officials, and the denial of contact visits is not necessarily unconstitutional. Jordan v. Wolke, 615 F.2d 749, 753 (7th Cir.1980). Nothing in the Constitution requires that pretrial detainees be allowed contact visits when prison administrators have determined that such visits will jeopardize the security of the facility. Block v. Rutherford, 468 U.S. 576, 588-89, 104 S.Ct. 3227, 3233-34, 82 L.Ed.2d 438 (1984). Accordingly, plaintiff's claims that he was denied access to the courts, his mail, writing materials, contact visits, and the telephone are not persuasive.
O. Punitive damages may be awarded in § 1983 actions when a defendant's conduct involves reckless or callous indifference to the plaintiff's federal protected rights. Smith v. Wade, 461 U.S. 30, 35, 51, 103 S.Ct. 1625, 1629, 1637, 75 L.Ed.2d 632 (1983). The record does not disclose defendants' conduct here involved reckless or callous indifference to plaintiff's federally protected rights.
P. Plaintiff is entitled to nominal damages since he established that certain defendants violated his constitutional due process rights. The Court finds that plaintiff suffered no actual harm as a result of his segregation for six days. Carey v. Piphus, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978). The Eighth Circuit Court of Appeals has relied upon a per day amount when fixing an award for damages for unconstitutional confinement. See generally Maxwell v. Mason, 668 F.2d 361, 365-66 (8th Cir.1981) (court awarded plaintiff the sum of $100 per day for each day of wrongful segregated confinement). Accordingly, the Court awards plaintiff the sum of $600.00 in damages for six days in punitive segregation at $100.00 per day, to be paid by defendants Medium Security Institution of St. Louis, Edward Tripp, Phillip McLucas, Herbert Casey, and Vada Anderson.
Q. Finally, as announced in open Court at the conclusion of the trial, the Court finds plaintiff did not establish, either at trial or in his proposed findings of fact and conclusions of law, the personal participation of the following named defendants in the conduct at issue here, and so no constitutional claim for damages was established against the following defendants: the City of St. Louis, Claude Woodson, Edward Thomas, Paul Berra, Jeannette Arnold, and the St. Louis City Department of Welfare.
Accordingly, judgment will be entered in favor of plaintiff on his claim of punishment in violation of his due process rights *998 against defendants Medium Security Institution of St. Louis, Edward Tripp, Phillip McLucas, Herbert Casey, and Vada Anderson in the amount of $600.00, jointly and severally; and judgment will be entered in favor of defendants Medium Security Institution of St. Louis, Charles O'Neal, Division of Adult Correctional Services, Commissioner Edward Tripp, Phillip McLucas, Maurice Harris, Mark Blumenthal, Herbert Casey, Vada Anderson, Madeline Percich, Jean Caramana, and the Adjustment Committee and its members: Oscar Bennett, David Kovac, and Elizabeth Smith-White, and against plaintiff on all of plaintiff's other claims.
In light of judgment being entered in favor of plaintiff on one of his claims, the parties will be directed to file briefs addressing whether plaintiff is a "prevailing party" for purposes of an award of costs and fees under 42 U.S.C. § 1988.