James BENJAMIN, et al., Plaintiffs,

v.

Allyn R. SIELAFF, et al., Defendants.

Ernesto MALDONADO, et al., Plaintiffs,

v.

William CIUROS, Jr., et al., Defendants.

DETAINEES OF THE BROOKLYN HOUSE OF DETENTION FOR MEN, et al., Plaintiffs,

v.

Allyn R. SIELAFF, et al., Defendants.

DETAINEES OF the QUEENS HOUSE OF DETENTION FOR MEN, et al., Plaintiffs,

v.

Allyn R. SIELAFF, et al., Defendants.

Iola FORTS, et al., Plaintiffs,

v.

Allyn R. SIELAFF, et al., Defendants.

Guy Zepth AMBROSE, et al., Plaintiffs,

v.

Allyn R. SIELAFF, et al., Defendants.

75 Civ. 3073(MEL), 76 Civ. 2854(MEL), 79 Civ. 4913(MEL), 79 Civ. 4914(MEL), 76 Civ. 101(MEL) and 76 Civ. 190(MEL).

United States District Court, S.D. New York.

Nov. 30, 1990.

Phillip L. Weinstein, Theodore H. Katz, Jonathan S. Chasan, John A. Beck, Dale A. Wilker, The Legal Aid Soc., Prisoners' Rights Project, New York City, for plaintiffs.

Victor A. Kovner, Corp. Counsel, New York City (Leonard Koerner, Paul Rephen, Asst. Corp. Counsel, of counsel), for defendants.

LASKER, District Judge.

Approximately 120,000 inmates were admitted to New York City jails last year. The Department of Correction is faced with the difficult task of finding beds for approximately 250 new inmates each day.[1] After these inmates are initially processed in court, they are transported to one of the jails on Rikers Island or to one of the Borough facilities. At each of these facilities, Department personnel classify the inmates, medically screen them, and assign them to beds. While awaiting the completion of these processes, inmates are confined in "receiving rooms." In receiving rooms, inmates do not have beds and have only limited access to toilets, showers, medical care and other essential services.

In March 1981, the plaintiffs moved for relief as to the conditions in the receiving rooms alleging that, "Detainees are being required to sleep in dayrooms and receiving rooms, as well as in dormitories filled far beyond their capacity," with resulting chaotic conditions.[2] An order was entered (the "1981 Order") enjoining the Department from housing inmates in non-housing areas, such as dayrooms, receiving rooms, gymnasiums and program space.[3]

---

1. These figures were obtained in a telephone conversation with Robert Daly, General Counsel to the Department of Correction.

2. Supporting Affidavit of Jonathan S. Chasan (March 1981).

3. It is established that a jail's failure to provide detainees with legitimate housing space violates the Fourteenth Amendment. *Lareau v. Manson*, 651 F.2d 96, 105 (2d Cir.1981) (prisons' use of non-housing areas for pre-trial detainees unconstitutional without regard to duration of confinement); *Vasquez v. Gray*, 523 F.Supp. 1359, 1365 (S.D.N.Y.1981) (use of floor mattresses for more than a few hours on night of admission unconstitutional); *Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 996–97 (3d Cir.1983), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984) (elimination of "unsanitary and humiliating" practice of forcing detainees to sleep on floor mattresses essential to bring jail up to constitutional standards); *Stewart v. Gates*, 450 F.Supp. 583, 588 (C.D.Cal.1978) ("basic concepts of decency, as well as reasonable

In April 1989, inmates were again required to spend days of confinement in gymnasiums and unsanitary receiving rooms and court pens. As a result, plaintiffs moved to hold defendants in contempt for violating the 1981 Order. On May 3, 1989, having concluded that members of the plaintiff class had been subjected in receiving rooms to "degrading, dangerous, unhealthy and unconstitutional conditions" for as long as several days at a time, this court issued an order (the "1989 Order" or the "Order") prohibiting the Department of Correction from confining inmates in non-housing areas for more than twenty-four hours. The Order also required defendants to house "overload inmates" (inmates being transferred from a housing area in one facility to a housing area in another facility) without delay, setting a guideline of twelve hours. To ensure compliance with the Order, the Department was required to report weekly to the court on a detailed basis as to the extent of compliance as well as to carry out the actions promised by then-Commissioner Koehler in his affidavit of April 17, 1989. These included the establishment of an inmate tracking system and an admission control center, the acquisition of additional buses and the expansion of medical and correctional staff assigned to receiving rooms and court pens. The court declined at that time to hold defendants in contempt.

Some of the measures promised in the Koehler Affidavit were adopted and remain in place today. Others were adopted and subsequently abandoned. Some were never adopted.[4] In April of 1989, the department established a new admission control center which continues to operate today. An inmate tracking system was put in place, but intradepartmental memoranda indicate that it has not always produced accurate results. Although the Department agreed to add eleven rally wagons to its transportation fleet, the Department now maintains that the seven it has added are sufficient to perform the required tasks. Only some of the new staff positions allocated for admissions processing were in fact filled.[5]

The Department remained in substantial compliance with the 1989 Order for approximately one year.[6] However, compliance began to unravel in May of 1990 and deteriorated dramatically during the summer and fall of 1990. Required weekly reports were submitted to the court regularly from May 1989 until June 18, 1990, but after June 18, 1990, the Department failed to send reports to the court.

No request was made for modification or temporary waiver of the terms of the Order. On November 5, 1990, the plaintiffs filed the present motion to hold the defendants in contempt for violation of the Order.

The defendants do not dispute the facts: that over the past six months, hundreds of inmates have been sleeping on the floors of receiving rooms and on cots in gymnasiums. As counsel for the plaintiffs declared in his affidavit, based on personal knowledge:

respect for constitutional rights, require that [detainees] be provided a bed").

Similarly, confining detainees in receiving rooms pens and gymnasiums which lack operative toilets and requiring that inmates be escorted by correction officers to bathrooms violates the Fourteenth Amendment. *Flakes v. Percy*, 511 F.Supp. 1325, 1329 (W.D.Wisc.1981) ("However primitive and ordinary, the right to defecate and to urinate without awaiting the permission of the government ... are rights close to the core of the liberty guaranteed by the due process clause ..."); *Wolfish v. Levi*, 439 F.Supp. 114, 157 (S.D.N.Y.1977), *aff'd in part and rev'd in part on other grounds*, 573 F.2d 118, 133, n. 31 (2d Cir.1978), *rev'd on other grounds sub nom Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("... [I]t falls today

below an acceptable level of humaneness to confine a prisoner of any sex where he or she must solicit freedom to use a toilet").

4. Affidavit of Theodore H. Katz in Support of Plaintiffs Motion for Contempt (November 1, 1990) ("Katz Affidavit"), Exhibit 5, Letter of Assistant Commissioner Toni Bair to the Court, dated September 10, 1990.

5. While eight new positions were approved for the Management Evaluation Division, only five were filled. Katz Affidavit, Exhibit 5, Letter of Assistant Commissioner Toni Bair to the Court, dated September 10, 1990.

6. Less success was achieved with regard to the timely housing of overload inmates.

The conditions to which plaintiffs are being subjected for days on end are reminiscent of the nightmarish conditions we observed in 1989.... Detainees have been forced to sleep on crowded, filthy floors in close proximity to seriously ill people, many of whom have not been medically screened; they must rely on inadequate numbers of grossly unsanitary toilets and sinks; access to telephones is *de minimis* or nonexistent, with the result that many inmates have been lost to their families and attorneys; access to showers is rare or nonexistent; access to medical care and critical medication is sporadic at best.[7]

Inmates crowded together on the floor of a small holding pen have had to resort to a shared plastic container to urinate and inmates in need of essential prescription medications such as methadone, dilantin and psychotropic drugs have not received them.

It is clear that high-level Department officials knew of these conditions and knew that they violated the 1989 Order. The defendants argue, nevertheless, that they should not be held in contempt because they have made good faith efforts to comply with the Order, but were prevented from doing so by events beyond their ability to predict or control.

A hearing on the motion was held on November 15, 1990. Commissioner Allyn Sielaff testified as to the Department's efforts to comply with the Order, the obstacles to compliance, and the reasons that he believes that the Department will be able to comply in the future.

The conclusion to be drawn from the record is that the violation of the Order constituted a contempt of court. There can be no doubt that by housing inmates in gymnasiums and receiving rooms without seeking a dispensation from the court, the Department willfully disregarded the Order. The Commissioner commendably acknowledged this fact when, during the hearing, he apologized for his failure to consult with the court prior to violating the terms of the Order.

## I.

■ "Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damage sustained by reason of noncompliance." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949). A court may hold a party in civil contempt if (1) the order the party allegedly has failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply. *N.Y. State Nat. Organization for Women v. Terry*, 886 F.2d 1339 (2d Cir. 1989).

■ In the case at hand, there is no argument that the 1989 Order is unclear or ambiguous and the defendants do not dispute that they have failed to comply with it. Accordingly, the sole issue is whether the defendants have attempted diligently in a reasonable manner to comply.

The Commissioner testified that he was prevented from complying with the Order due to personnel changes, population growth, a delay in the opening of the new Nursery Beacon facility, a large number of unusable or "down" cells, and a number of unusual incidents at Rikers, including a strike by corrections officers and a demonstration by inmates, an interruption of water service, a measles epidemic, and the temporary loss of the use of two ferry boats. The Commissioner also outlined the steps which he and his staff have taken in attempting to achieve compliance.[8]

Department figures indicate that until May of 1990, the percentage of new admissions not housed within twenty-four hours generally hovered around 1–5%, although on occasion it rose as high as 10%.[9] However, from May 14 through May 20, 1990,

---

7. Katz Affidavit at ¶ 11.

8. Attached are two appendices which expand on this testimony.

9. Katz Affidavit, Exhibit 5, Letter from Assistant Commissioner Toni Bair to Court (September 10, 1990) at Exhibit B.

12.5% of inmates newly admitted to city jail facilities were not housed within twenty-four hours.[10]  In three out of four weeks in June 1990, more than 10% of new admissions were not housed within twenty-four hours.[11]

By late June, the situation at the Anna M. Kross Center ("AMKC"), one of the facilities on Rikers Island, had attracted the attention of Richard Wolf, Executive Director of the New York City Board of Correction, who wrote to the warden of AMKC on June 29, 1990, stating:

> It is our perception that there has been a deterioration in the processing of inmates in and out of AMKC through the receiving room.... Staff explained that processing was slowed due to shift reductions, few available beds in the building, and large numbers of incoming inmates who refused housing, claiming they had enemies in the jail.... By copy of this letter, we are notifying the Office of Compliance Consultants of apparent violations of Judge Lasker's requirements that beds be found expeditiously for transferred inmates and those newly admitted to the Department's custody. Please let us know what steps you are taking to remedy the conditions described in this letter.[12]

A copy of this letter was sent to Commissioner Sielaff.

The percentage of inmates not housed within twenty four hours rose to 18.9% in the week from July 9 through July 15, 1990.[13]

On July 11, Theodore Katz of the Legal Aid Society wrote to Kenneth Schoen, Director of the Office of Compliance Consultants ("OCC"), citing evidence of "serious deterioration" in the new admissions processing system:

> DOC [Department of Correction] tracking reports reflect greater numbers of inmates exceeding the new admission 24–hour requirement and overload 12–hour requirement.  Reports by my staff, OCC staff and Board of Correction staff (see letter to Warden DeRosa from Richard Wolf, dated June 29), confirm the fact that larger numbers of inmates are remaining without housing beyond the Order's requirements and that physical conditions in the pens are beginning to resemble the shocking conditions that we brought to the Court's attention in last Spring's contempt proceedings.[14]

A copy of this letter was sent to Commissioner Sielaff; on July 16, 1990, Schoen himself wrote to the Commissioner urging him to pay attention to the issues raised in the letter.[15]

On July 18, 1990, Christina Bertholf of OCC wrote a memorandum to Kenneth Schoen noting that inmates were still being housed in the AMKC receiving room and that those inmates were not receiving certain essential services such as phone calls, recreation, religious services, medical attention and daily showers.  The memorandum declared that "The environmental conditions of the holding pens were unacceptable.  The toilets were clogged-up and emitting a foul odor.  The floors were dirty and needed to be swept and mopped."  The memorandum also indicates that receiving room staff stated that there had been shift reductions at receiving room posts and that there was no medical clerk on duty to pull inmate medical records.[16]  A copy of this memorandum was sent to Commissioner Sielaff.

---

10.  *Id.*

11.  *Id.*

12.  Exhibit 6, Letter of Richard Wolf, Executive Director of the Board of Correction of the City of New York, to Warden Robert DeRosa of the Anna M. Kross Center, dated June 29, 1990.

13.  Katz Affidavit, Exhibit 5, Letter from Assistant Commissioner Toni Bair to Court (September 10, 1990) at Exhibit B.

14.  Plaintiffs' Exhibit 7, Letter of Theodore H. Katz to Kenneth Schoen, dated July 11, 1990.

15.  Plaintiff's Exhibit 21, Letter of Kenneth Schoen to Commissioner Allyn Sielaff, dated July 16, 1990.

16.  Plaintiffs' Exhibit 20, Memorandum of Christina Bertholf to Kenneth Schoen, dated July 18, 1990.

On July 17, 1990, Michael Cleary, chief of the Department, issued a memorandum to Gerald Mitchell, executive director of the Department's Management Evaluation Division, in which he stated, "over the course of the past several weeks, my staff has seen a steady erosion taking place within th[e new admission tracking] process." The memorandum refers to unreliable data, computer breakdowns and discrepancies between the manual tracking system and the number of inmates actually in the receiving room.[17]

August brought a precipitous increase in the percentage of inmates not housed within twenty-four hours: 24.2% in the first week, 67.1% in the second week, 50.7% in the third week and 37.8% in the fourth week.[18]

The Office of Compliance Consultants' Progress Report to the court of August 17, 1990 revealed that "[s]pot checks by OCC confirm reports that adherence to the court order has deteriorated ... [W]ords like 'bedlam' and 'chaos' would not be excessive in describing the conditions in the receiving room." [19] Upon receipt of this disturbing information, the court asked the Department for a full report of the facts. On September 10, 1990, Assistant Commissioner Toni Bair reported to the court that "A review indicates that in June 1990, the percentile for housing new admissions starts to decline." Bair reviewed the status of the measures which the Department promised to adopt in the Koehler Affidavit of April 1989. He reported that some admission posts were cut, but that all positions cut would be restored except for those in the transportation division.[20] A copy of the report was sent to Commissioner Sielaff.

Widespread non-compliance continued through September and October. From September 11 through September 19, 76% of new admissions to the Manhattan Detention Complex ("MDC") failed to receive housing until after they had been in receiving rooms for more than twenty-four hours. At the Bronx House of Detention, 42% of those admitted exceeded the twenty-four hour requirement. From September 18 through 24, 71.5% of admissions to the MDC, 82.8% of admissions to the Anna M. Kross Center ("AMKC") and 76.9% of admissions to the Rose M. Singer Center ("RMSC") exceeded the twenty-four hour requirement. From September 25 through October 1, 1990, virtually all AMKC admissions were in the receiving room for more than twenty-four hours. At the Brooklyn House of Detention, 31.6% of admissions were housed in violation of the Order; 31.4% of Bronx House of Detention admissions were housed in violation of the Order; 30.1% at the Otis Bantum Correctional and 38.9% at the Singer Center. Similar figures recurred throughout October.[21]

On September 19, 1990, Gerald Mitchell, Chief of the Department of Correction, issued a memorandum to a number of wardens and assistant deputy wardens stating:

It has come to my attention that we are falling out of compliance with Operations Order # 16/89 which mandates that we house all new admission inmates within 24 hours of accepting them into our custody. It is imperative that we remain in compliance with this order, as it is a direct result of the court order from Judge Lasker. When we first implemented this operations order, many facilities were given additional posts to handle the volume and to man the personal computer tracking systems. It is my understanding that some of you gave up these posts as part of the post cuts of last winter. This is unacceptable. Because they are mandated by court order, cutting one of these posts is tantamount

**17.** Plaintiffs' Exhibit 51, Memorandum from Michael Cleary, Executive Director of the Management Evaluation Division, to Gerald Mitchell, Chief of the Department of Correction, dated July 17, 1990.

**18.** Katz Affidavit, Exhibit 5, Letter from Assistant Commissioner Toni Bair to Court at Exhibit B, dated September 10, 1990.

**19.** Plaintiffs' Exhibit 8, Report of Office of Compliance Consultants, dated August 17, 1990.

**20.** Katz Affidavit, Exhibit 5, Letter of Assistant Commissioner Toni Bair to the Court, dated September 10, 1990.

**21.** *Id.*

to cutting the law library post or any standard posts.[22]

The memorandum directed wardens to reappoint admissions staff whom they had allowed to be transferred to other areas.

On October 21, 1990, 22 inmates slept in the Brooklyn House of Detention gymnasium. On October 22, 155 inmates slept in gymnasiums throughout the system and on October 28, 338 inmates.[23]

On October 29, 1990, Robert Daly of the Department of Corrections wrote Richard Wolf of the New York City Board of Corrections to inform him that the Department was housing inmates in gymnasiums.[24] The following day, Wolf wrote to Commissioner Sielaff stating:

> Both AMKC and OBCC have converted gymnasiums into *de facto* housing areas.... As you know, Board Chairman Robert Kasanof wrote to Robert Daly ... and informed him that the Board would not vote on the Department's request for open-ended variances to house inmates in gymnasiums, but instead would defer to Judge Lasker....
>
> The unavailability of basic services to detainees who are obliged to sleep in gymnasiums is contributing to steadily rising levels of tension among both inmates and staff. Uniformed staff at OBCC acknowledged that inmates placed in the gym late Friday night were unable to shower until Sunday afternoon. Many of these inmates already had spent one or two days in the OBCC receiving room before they were moved into the gym.[25]

Wolf went on to note:

> Contributing to the heightened tension is the recent practice, acknowledged by department officials, of requiring some General Population housing areas to "pack up" and move to receiving rooms. Some remain there for extended periods;

others are transferred to a gymnasium in the same facility or are moved to another jail's receiving room and, thereafter, to its gymnasium. Facilities have "backfilled" the vacancies thus created with newly admitted detainees.

> This practice has been described by Department staff as part of an attempt to comply with Judge Lasker's Order in the *Benjamin* case, which requires that newly-admitted detainees must be provided a bed in a housing area within twenty-four hours of remand to DOC custody. DOC staff are quick to acknowledge, however, that it could not have been the Court's intention that its Order would cause detainees who had already been housed to lose their beds in housing areas so that newly-admitted detainees could receive them.[26]

Several days later, the plaintiffs moved to hold the defendants in contempt.

## II.

It is true that no corrections department exercises control of the size of its population. The number of its inmates depends on crimes committed, arrests, prosecutions and court dispositions. However, every corrections department, and the city whose agency it is, has the responsibility of planning for expectable events. Recent years in New York City and elsewhere have put all of the parties on notice that it is expectable that there will be unpredicted surges in population and that suitable preparations including an appropriate margin of capacity must be available to accommodate such events. In every crisis such as the one at hand, the City has argued that its failure to comply is based on unforeseeable events. This is not the first time around on this argument. In 1986, we commented that:

**22.** Plaintiffs' Exhibit 34, Memorandum of Gerald Mitchell, Chief of the Department of Correction, to Distribution, dated September 19, 1990.

**23.** Katz Affidavit at ¶ 10.

**24.** Plaintiffs' Exhibit 24A, Letter of Robert Daly, General Counsel of the Department of Corrections, to Richard Wolf, Executive Director of the Board of Corrections of the City of New York, dated October 29, 1990.

**25.** Plaintiffs' Exhibit 24B, Letter of Richard Wolf, Executive Director of the Board of Corrections of the City of New York, to Commissioner Allyn Sielaff, dated October 30, 1990.

**26.** *Id.*

The City cannot evade the fact that it bears a significant share of responsibility for the current crisis in its jails.... [T]he City has consistently underestimated the projected jail populations and continued to do so even after the "crack" crisis commenced.

*Benjamin v. Malcolm*, 646 F.Supp. 1550, 1554 (S.D.N.Y.1986). In 1989, we commented that:

The presence of excess parole violators and other categories of State inmates in the city prisons is lamentable but was certainly foreseeable; it has been consistently cited as a problem by the City during previous requests for relief. As to legislative restrictions on the implementation of the supervised detention program, these were announced approximately one year ago and are thus not unexpected. In sum, the City must accept the responsibility for dealing with the increase in population.

*Benjamin v. Koehler*, 710 F.Supp. 91, 93 (S.D.N.Y.1989).

The contributing events described by the Commissioner are not for the most part extraordinary and unforeseeable; if not routine, they are the kind of emergencies which, as the history of the Department demonstrates, because of their constant repetition, have come to be predictable. Planning must be made on the assumption that such events will occur. If the system cannot make adequate forecasts of population growth, including an appropriate margin of error, or cannot, because its projections are inadequate, accommodate prisoners in accord with legal requirements, the only solution may be to limit the number of prisoners who can be admitted or held in the respective facilities.

Although the efforts demonstrate the Commissioner's good faith in trying to achieve compliance with the Order, "[t]he fact that the prohibited act was done inadvertently or in good faith, however, does not preclude a citation for civil contempt." *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 128 n. 2 (2d Cir.1979) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1948)). Unfortunately, the Department's earlier efforts have proved to be too little, too late. Since the filing of this motion, compliance has been achieved. It is reasonable to believe that the procedures now in place could have been invoked earlier. The sequence of events demonstrates that the situation could have been taken in hand when it first surfaced in June or July. The Commissioner testified that the first major problem with compliance with the Order occurred in August 1990. However, the New York City Board of Correction notified the Department of apparent violations of the Order as early as June 29, 1990. For a substantial time after learning of pervasive violations, the Department failed to take meaningful action.

The Commissioner emphasized that he authorized the housing of inmates in gymnasiums because it seemed more humane than forcing them to remain in crowded receiving rooms, which indeed it was. While there is no reason to disagree with the Commissioner's conclusion regarding the relative humanity of gymnasiums versus receiving rooms, neither gymnasiums nor receiving rooms are constitutionally acceptable housing areas and the use of either violates the 1989 Order.

Moreover, the Department was fully aware of the substantial violations of the Order, without excuse or permission, and in further violation of the Order, failed to keep the Court informed, to justify its violations, or to apply for temporary modification of the Order.

The Commissioner testified that the weekly reports to the court were discontinued because the staff member who had previously prepared them had been reassigned to a different position within the Department. The proffered excuse is notably insufficient. It is hard to believe that no other person among the thousands of Department employees was capable of preparing the reports; and if that were so, then the original "reporter" should not have been transferred until a replacement was trained. In any event, the court should have been kept informed of the state of affairs.

As is now acknowledged, when violation seemed inevitable, the Department could and should have put the matter before the court with a request for temporary modification of the terms of the order. As the Supreme Court pointed out in *McComb v. Jacksonville Paper Co.*, "if there were extenuating circumstances or if the decree was too burdensome in operation there was a method of relief apart from an appeal. Respondents could have petitioned the District Court for a modification, clarification or construction of the order." 336 U.S. at 192, 69 S.Ct. at 500. Over the past nine years, requests for such relief have been granted on five of the nine occasions on which the defendants have sought such relief. *Benjamin v. Koehler*, 710 F.Supp. 91, 92, n. 2 (S.D.N.Y.1989). While the Department informed both the State Commission on Corrections and the Board of Corrections of the violations, the court was not advised of the details of the situation until the filing of the instant motion by the plaintiffs.

Because the Department failed "diligently [to] attempt[ ] in a reasonable manner to comply" with the 1989 Order, the Department is found to have been in contempt.

### III.

■ It remains to determine what sanction or remedy is appropriate.

"[T]he grant or withholding of remedial relief is not wholly discretionary with the judge." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, citing *Union Tool Co. v. Wilson*, 259 U.S. 107, 111–112, 42 S.Ct. 427, 429, 66 L.Ed. 848. Indeed, "[t]he private or public rights that the decree sought to protect are an important measure of the remedy." *Id.*

The defendants have previously been ordered to refrain from confining any inmate in a holding cell, room, or other non-hous-

ing area which lacks unmediated access to an operable toilet and sink. They have also been ordered to create a list which identifies and tracks each inmate who is held in violation of the Order, including the amount of time that violation persists for each individual.

Plaintiffs propose the imposition of coercive fines of $1,000 per inmate per day for any day which defendants violate the 1989 Order in any respect, escalating to $2500 per person per day if the defendants continue to violate the Order after the first week, to be used to establish a bail fund. They request further that a special master be appointed to monitor compliance, report violations to the court, and administer the bail funds, and propose further remedial damages to each newly-admitted inmate who is held in a non-housing area for more than twenty-four hours of $150 for the first twenty-four hours and a further $100 for each twelve hour period thereafter. In addition they propose that each overload inmate should be awarded $75 for each twelve hour period or portion thereof he or she remains unhoused after the first twelve hours of removal from his or her initial housing area.

If these remedies fail to compel compliance, the plaintiffs request that the court order the city to admit no new prisoners to its jails unless a bed in a housing area can be provided to all new admissions.

The appropriate sanction in the present circumstances is to impose compensatory damages to be paid to any member of the plaintiff class who, in the future, as a new admission, is held in a non-housing area for more than twenty-four hours. For the first twenty-four hours thereafter or any part thereof, each such individual shall be paid $150, and for each additional twelve hour period, or any portion thereof, an additional $100.[27] Defendants' failure to comply with

**27.** As the Court of Appeals for the Third Circuit has held, there is no requirement of an evidentiary basis for the exact amount of an award of compensatory damages using an "accountant's methodology" because by that method "no price could be fixed and the constitutional wrong would go uncompensated." *Sample v. Diecks*, 885 F.2d 1099 (3rd Cir.1989). Examples of damages awarded based upon claims of uncon-

stitutional confinement include: *Charron v. Medium Security Institution*, 730 F.Supp. 987 (E.D.Mo.1989) ($100/day for confinement in punitive segregation); *Maxwell v. Mason*, 668 F.2d 361 (8th Cir.1981) ($1400 for 12 days solitary confinement without bed or clothing); *Patterson v. Coughlin*, 722 F.Supp. 9 (W.D.N.Y. 1989) ($100/day for unlawful confinement in

the Order subjects plaintiff class members who are forced to spend days on end in holding pens without beds or proper bathroom facilities to real and substantial harm. It is therefore appropriate that inmates detained in violation of the Order be compensated.

The requirement for compensation is supported by and consistent with the Court of Appeals' ruling in *Badgley v. Santacroce*, 800 F.2d 33 (2d Cir.1986), that

> The District Court is ... directed [in the event of any subsequent failure by the defendants to follow the court's order] to assess compensatory damages in favor of the plaintiffs of not less than $5,000 for each person admitted to the NCCC [Nassau County Correctional Center] in violation of the amended consent judgment and to order any additional remedies that may be appropriate.

800 F.2d at 39.

Since the record with regard to overload inmates is sparse, no action is taken as to them at this time. The request for the appointment of a special master is denied because the Office of Compliance Consultants is capable of performing such monitoring tasks as are necessary. The request for fines of $1000 per day per inmate to be used for a bail fund is denied. In times of such serious financial problems as the City of New York faces, such a burden should not be imposed on the city unless no other course is effective.

The imposition of these sanctions is done in the hope that such sums will never have to be paid because the Department will be in compliance. Indeed, the sole and only permissible basis for imposing the sanction is to assure compliance. However, since the problem has existed for nearly ten years, and has come before the court on three separate occasions, if the sanctions ordered prove ineffective, serious consideration would have to be given to limiting the number of inmates who can be admitted to the respective institutions.

In sum, it is totally within the control of the Department as to whether any such compensation will ever have to be paid. Compliance with the Order will obviate the need to make any such payments.

Submit judgment on notice.

## APPENDIX A

*Resume of Testimony Regarding Obstacles to Compliance*

1. Change of Personnel

The Commissioner testified that one of the reasons for noncompliance was employee turnover resulting in the presence of inexperienced staff in key admissions positions. For example, George Vierno, who had been responsible for inmate assignments for twenty years, retired. The Commissioner expressed confidence that his staff is now trained and capable of conducting admissions properly.

The Commissioner testified that budget problems have not significantly affected the situation; he observed that of 171 officers assigned to process admissions, the Department lost only five positions, and all but one have been restored. Although there were no cutbacks in the medical staff, the Commissioner acknowledged that there were some medical vacancies.

2. Population Growth

The Commissioner testified that the Department was unable to comply with the court's order because of large and unexpected growth in the inmate population. In the last 18 months, the average inmate population has grown by 2800 while the Department has added only 2100 beds. He cited "seasonal peak," a change in the population mix, and increased court delays in disposition of cases as the chief causes of this "surge" in population.

a. Seasonal Peak

Population statistics indicate that the New York City jails historically have experienced a seasonal peak in inmate population in October and February of every year. The Commissioner testified that be-

punitive segregation), *aff'd in part and rev'd in part,* 905 F.2d 564 (2d Cir.1990) (summary judgment on damages inappropriate where jury trial originally demanded by plaintiff).

yond the usual October seasonal peak, the Department this year was faced with an unanticipated surge of 1000 inmates in September and October.

### b. Different Mix of Population

The Commissioner's testimony indicated that a major contributing factor was a backlog of state inmates, including parole violators. During the months of September and October, while the city-sentenced inmate population went down about 5%, the detainee population increased by about 5%. City-sentenced inmates are easier to accommodate because, as opposed to detainees, they may be transferred to the two northern institutions which are run by the state for the city and the city is able to get variance approval to house more of these inmates in a smaller space.

### c. Court Delays

The Commissioner testified that an increase in state court processing times from 41 days to 46 days has effectively deprived the Department of 1500 beds.

### 3. Delay in Opening of Nursery Beacon

The Commissioner testified that if the new Nursery Beacon jail facility had opened when expected, the Department would have been able to comply with the Order. However, due to the presence of methane gas on the building site, the opening of that facility has been delayed indefinitely.

### 4. Strike and Demonstration at Rikers, Shutdown of Water at Rikers, Measles at Two Facilities, Ferry Boats

A variety of other events contributed to the Department's inability to comply with the Order. On August 13, 1990, correction officers blocked the bridge at Rikers Island, thereby interfering with the transportation of inmates to court and delaying the release of some inmates. In response to the correction officers' action, inmates created a disturbance at the Otis Bantum Center. About the same time, a shutdown of water going into Rikers occurred which limited the number of inmates who could be admitted to Rikers facilities. In addition, a measles epidemic at the Otis Bantum Center and the Queens House of Detention prevented the Department from transferring inmates into those facilities. Finally, two Department ferryboats had to be removed from service in order to meet Coast Guard requirements for the scraping of the hulls, temporarily depriving the Department of the use of 300 beds.

### 5. Down Cells

As many as 600 cells at a given time have recently been unusable because of broken plumbing fixtures and inoperable doors. When the fiscal year ended on June 30, 1990, the department had already used all the repair materials that had been budgeted and the Department had no additional inventory of those materials. The Commissioner admitted that the Department could have acted faster in beginning the process of purchasing repair materials.

### APPENDIX B

*Testimony Regarding Steps Taken to Achieve Compliance*

### 1. Down Cell Task Force

Beginning July 1, 1990, the Office of Management and Budget and the Mayor's Office authorized the Department to establish a Down Cell Task Force, that is, staff dedicated to the repair of unusable cells. Moreover, $500,000 was allocated for the purchase of parts and the Commissioner has committed an additional $750,000 from the Department's own budget to the purchase of repair parts so that an inventory can be maintained.

The Commissioner has also appointed Assistant Commissioner Bill Jenkins to be responsible for monitoring the down cell situation.

### 2. Admissions Task Force

In May of 1990, the Commissioner established a task force to explore the possibility of centralizing the admissions process. The task force issued a report in July of 1990 recommending against centralization of the admissions process because they felt

it would hinder compliance with the twenty-four hour requirement.

### 3. Appointment of Deputy Chief for Compliance

The Commissioner elevated the position responsible for assignment of inmates to a deputy chief level. The chief of the Department held a number of meetings with wardens and deputy wardens for administration regarding their oversight of the movement of inmates in receiving rooms. Auditing of receiving room movements was made more rigorous.

### 4. Cooperation with State Authorities

The Commissioner testified that in May and July of 1990, he met with Thomas Coughlin, Commissioner of the State Department of Corrections, to consider how to make maximum use of the upstate jail facilities. He also met with Milton Mollen, Deputy Mayor for Public Safety, Commissioner Coughlin, and John Poklemba, State Criminal Justice Coordinator, to improve the system for removing backlogged inmates from city facilities. The Commissioner indicated that as a result, the State has recently moved 600 inmates from city facilities.

### 5. Parole Board

The Commissioner also met with the Chairman of the New York State Parole Board in Albany. The Chairman visited Rikers and ordered the Parole Examiners to meet in special sessions at Rikers to review cases. As a consequence, a number of technical parole violators have been released from city facilities.

The Commissioner further indicated that he and the Chairman of the Parole Board are exploring the possibility of proposing legislation to authorize hearing officers (at Rikers Island) to make final decisions with regard to the release of technical parole violators. The Commissioner speculated that a large number of beds at Rikers Island could be made available by eliminating Parole Board review of those decisions.

The Commissioner also cited the possibility of increased use of the "high impact" incarceration program (an urban boot camp whose participants receive reduced sentences), drug programs and work release programs as a possible way to move inmates out of city jail facilities faster.

### 7. Bail Re-Evaluation

The Commissioner has met several times with Justice Milton Williams, administrative judge for the State courts, and the administrative judges of the Brooklyn and Manhattan courts regarding a bail re-evaluation program which might result in the release of some detainees pending trial.